**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Criminal Case No.** |
| **v.** | 1:22-cr-00015-APM |
| **KELLY MEGGS** | |
| **ACCUSED** | |
| *Styled as <u>USA v. STEWART RHODES, et al.</u>* *incorporating cases against multiple Defendants* | Assigned to the Honorable Amit Mehta, District  Court Judge |

**KELLY MEGGS' MEMORANDUM OF LAW IN SUPPORT OF HIS**
**MOTION FOR RELEASE FROM PRE-TRIAL DETENTION and**
**OPPOSITION TO EXCLUSION OF TIME UNDER THE SPEEDY TRIAL ACT**

Pursuant to the Eighth Amendment to the U.S. Constitution, the Sixth Amendment to the

U.S. Constitution, the Speedy Trial Act codified in 18 U.S.C. §§  3161-3174 , Section 3145(i)

and Section 3145(b) of Title 18 of the United States Code, Kelly Meggs, by and through the

undersigned counsel, respectfully moves this Court for an Order revoking or amending the

pretrial detention of Kelly Meggs and/or his release for preparation for trial.

18 U.S. Code § 3142 (i) provides that:

> \* \* \*
> \* \* \*
> The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

~~Kelly Meggs has been~~ detained in this matter following a detention hearing requested by the

government pursuant to section 3142(f)(1)(A) and (B) of Title 18 of the United States Code.

However, because the government has neither charged Kelly Meggs with a "crime of

violence" nor with a felony that involves the possession or use of a "dangerous weapon," the

government was not entitled to seek the detention of Kelly Meggs pending a trial in this matter. Moreover, even if the government was entitled to a detention hearing, the government has failed to prove, by clear and convincing evidence, that Kelly Meggs poses a dangerous threat to his community.  And even if the government has met its burden, it has nevertheless failed to demonstrate, again by clear and convincing evidence, that no condition, or combination of conditions, could reasonably assure the safety of the community.

Kelly Meggs opposes the government's request to toll any time under the Speedy Trial because of the "complex[ity] [of its] investigation" and submits, in the alternative, that any such tolling, in conjunction with the government's insistence on pretrial detention, constitutes a violation of Kelly Meggs's due process rights as guaranteed by the Fifth Amendment to the Constitution.

Specifically, the "complexity" is artificial and artificially created by the Government.

The Government rushed to indictment for political purposes of public relations on charges that carry at least a three years' statute of limitations.  This is a mess of the Government's own making.  As the then U.S. Attorney for the District of Columbia explained:

> Michael Sherwin: After the 6th, we had an inauguration on the 20th. So, I wanted to ensure, and our office wanted to ensure, that there was shock and awe that we could charge as many people as possible before the 20th. And it worked because we saw through media posts that people were afraid to come back to D.C. because they're like, "If we go there, we're gonna get charged."

Inside the prosecution of the Capitol rioters, CBS News, Mar. 22, 2021, available at: **https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03-21/**

~~Whether it is appropriate~~ or not to indict lots of people likely to be innocent for political or public relations purposes, one thing is clear:  The train wreck here was created by the Government.

Kelly Meggs demands that the Government proceed to trial immediately of his case.  While there are mountains of so-called "disclosures" that the Government has made which Meggs' defense

counsel would need to wade through and digest, (1) the Government is "disclosing" waterfalls of worthless junk (such as video of a parking garage where nothing happens all day, video of a door of the U.S. Supreme Court where nothing happens all day, etc., etc.) (2) the Government is systematically ignoring Defendants' counsel's demand for specifically-identifiable exculpatory evidence required to be produced – especially on specific request – and denying the Defendants access to needed information and identification of necessary witnesses in the Defendants' favor.  (3) the Government is clearly not ready to proceed to trial and will lose at trial, having made outlandish claims it can never prove.  (And the determination that the Government cannot prove those claims is not a random opinion, but a careful analysis of the grand jury testimony that has been provided so far and the limited witnesses and information that is available, even though inadequate to the Government's constitutional duties, and the misrepresentation of snippets taken out of context that will collapse when the entire conversations are presented in full.  Only snippets were provided to the Grand Jury according to the documents released to counsel so far.)

However, in the jaundiced view that typically evades the Sixth Amendment, the Speedy Trial Act objection could be mooted by releasing him from custody, including pursuant to 18 U.S.C. 3142(i).  The Speedy Trial Act is a problem because Kelly Meggs is in detention.  This can be cured or mooted

## I.   PROCEDURAL HISTORY

On January 12, 2022, Defendant Kelly Meggs was charged by the Government's ***eighth*** attempt to indict the Oath Keeper Defendants originally in *USA v. Thomas Caldwell*, by the Seventh Superseding Indictment.  Kelly Meggs was arraigned on the Seventh Superseding Indictment on January 25, 2022.  Therefore, arguably after the January 25, 2022, this is a new case.  The Government created a new case *USA v. Stewart Rhodes, et al.*, Criminal Case No. 1:22-cr-00015, and ended the criminal prosecution of Kelly Meggs under *USA v. Thomas Caldwell, et al.*, Criminal

Case No. 1:21-cr-00028.  Therefore, it appears that Kelly Meggs is now being prosecuted under a new case, and is entitled to a *de novo* review of pre-trial detention.

The Government sought and the Court applied a reversal of the presumption against detention on the grounds that Kelly Meggs ***DID NOT DAMAGE ANY FEDERAL PROPERTY***  but in some unspecified way aided and abetted some unspecified persons.  However, 18 U.S.C. 2 (aiding and abetting) is not listed among the offenses that qualify to reserve the presumption.

Now we know, however, that the according to the Grand Jury, Kelly Meggs arrived at the U.S. Capitol building (as opposed to the grounds) **around 2:32 PM EST** [1] on January 6, 2021, at the bottom of the broad center East side stairs and walked up the East-side, central stairs [2] starting **at around 2:35 PM**, [3]  and reached the landing at the top of the stairs **at around 2:39 PM**. [4] The doors opened (from the inside) **at 2:40 PM** [5]  and Kelly Meggs allegedly entered through the open doors.

But in COUNT V the latest Seventh Superseding Indictment alleges that Defendant Kelly Meggs either committed "depradation" of Property of the United States in violation 18 U.S.C. 1361 or aided and abetted others such depradation in violation of 18 U.S.C. 2.

However, in the indictment of HUNTER EHMKE issued on January 27, 2021, the same U.S. Attorney's Office for the District of Columbia induced the same Grand Jury to indict HUNTER EHMKE for causing that same damage to federal property **at 2:15 PM** at the top of the center East-side stairs near the Columbus Doors.  See, *United States of America v. Hunter Ehmke*, Case No.  1:21-cr-00029-TSC-1., ECF Dkt. # 6, attached.

Not only does the USAO charge HUNTER EHMKE with committing the depradation that Kelly Meggs is charged with committing **at 2:40 PM**, but the USAO alleges that this happened at

---

[1]	Seventh Superseding Indictment, ¶ 91
[2]	The USAO and the Grand Jury seem to have some weird fixation with stacks of pancakes, and keep referring to a nonsensical crazy idea of a stack.
[3]	Seventh Superseding Indictment, ¶ 95.
[4]	Seventh Superseding Indictment, ¶ 97 (about 1 minute after 2:39 PM).
[5]	Seventh Superseding Indictment, ¶ 97 (about 1 minute after 2:39 PM).

**2:15 PM**.  *United States of America v. Hunter Ehmke*, Case No.  1:21-cr-00029-TSC-1., ECF Dkt. # 11.

How many people are charged with breaking the same window?

Kelly Meggs could not have aided and abetted any one **at 2:39 PM** to depredate the window or anything in that area which occurred **at 2:15 PM** when he was not yet in the vicinity.

Not unless Kelly Meggs owns a time machine we don't know about.

There is new evidence and information that was unavailable during previous motions for release from detention on bail.  On or about December 1, 2021, the Government released two FBI 302 interviews with unindicted Oath Keeper member "PERSON TEN," wherein his statements debunk almost every charge against Kelly Meggs.

The Government has designated the ***unredacted*** copy of Federal Bureau of Investigation interview notes (Forms 302) with unindicted Oath Keeper [PERSON TEN] as sensitive under the Protective Order.   AUSA Kathryn Rackozy confirms that the sole basis for the designation under the Protective Order is the mention of persons who have not been indicted. Ms. Kathryn Rackozy confirms that other than the mention of people not indicted, the rest of the interview notes are not designated under the Protective order.

For example, the FBI interview notes with Oath Keeper leader Michael [PERSON TEN] on May 4, 2021, informed the Government on Page 4 of the 7 page interview that:

[PERSON TEN] responded negatively to the following questions:

- To your knowledge, was there was ever any discussion, by you or anyone you know (to include OKs), to take violent action on January 6, 2021, or after, if the Presidential election did not produce the desired result?

- ~~Was there ever any pre-planning, or planning on January 6th, by the OKs to incite riots at the U.S. Capitol?~~

- Was there ever any pre-planning, or planning on January 6th, by the OKs to forcibly enter to U.S. Capitol?

- Was there ever an pre-planning, or planning on January 6th, by the OKs to disrupt the transition of the Presidency?

- Regarding these questions, did you take any of these actions on January 6th?

- To your knowledge, did any members of the OKs take any of these actions on January 6th?


The phrasing is awkward, so it should be read in the direct formulation as meaning;

- FBI Interviewers: "To your knowledge, was there was ever any discussion, by you or anyone you know (to include OKs), to take violent action on January 6, 2021, or after, if the Presidential election did not produce the desired result?"

- OATH KEEPER MICHAEL [PERSON TEN]:  NO.

- FBI Interviewers: "Was there ever any pre-planning, or planning on January 6th, by the OKs to incite riots at the U.S. Capitol?"

- OATH KEEPER MICHAEL [PERSON TEN]:  NO.

- FBI Interviewers: "Was there ever any pre-planning, or planning on January 6th, by the OKs to forcibly enter to U.S. Capitol?"

- OATH KEEPER MICHAEL [PERSON TEN]:  NO.

- FBI Interviewers: "Was there ever an pre-planning, or planning on January 6th, by the OKs to disrupt the transition of the Presidency?"

- OATH KEEPER MICHAEL [PERSON TEN]:  NO.

- FBI Interviewers: "Regarding these questions, did you take any of these actions on January 6th?"

- OATH KEEPER MICHAEL [PERSON TEN]:  NO.

- FBI Interviewers: "To your knowledge, did any members of the OKs take any of these actionson January 6th?

- OATH KEEPER MICHAEL [PERSON TEN]:  NO.

On pages 4 to 5 of the 7 page interview 302, the Government knew on May 4, 2021, that:

[PERSON TEN] learned afterwards OKs had entered the U.S. Capitol, however advised no plan by the OKs included anyone going inside the U.S. Capitol. [PERSON TEN] likened the

"stack", which has been referred to publicly, as how a protection detail might move through a crowd. [PERSON TEN] advised the "stack" was not ideal, referring to the OKs who entered the U.S. Capitol, and he would not have done it in the manner it was conducted.

On page 5 of the 7 page interview 302, the Government knew on May 4, 2021, that:

[PERSON TEN] initially found out when KELLY MEGGS (MEGGS) sent [PERSON TEN] a message on Signal chat,  which [PERSON TEN] was unable to retrieve. MEGGS allegedly told [PERSON TEN] that MEGGS entered the U.S. Capitol to assist police, and those OKs who went inside assisted a police officer who was being surrounded by the crowd.

On page 5 of the 7 page interview 302, the Government knew on May 4, 2021, that:

[PERSON TEN] did not assault any LE Officers on January 6, 2021, nor to [PERSON TEN]'s knowledge did any OKs or anyone affiliated with the OKs who were assigned to or conducting security details. [PERSON TEN] was unaware of any OKs, including those who entered the U.S. Capitol, forcibly entering the U.S. Capitol.

[PERSON TEN] heard the door was open and the group walked in.

On page 6 of the 7 page interview 302, the Government knew on May 4, 2021, that:

[PERSON TEN] advised the overarching role of the OKs on January 6, 2021 was to provide protective security details and stage security for those individuals they were hired to protect, also ensuring the individuals would be safely escorted from the stage to their vehicles. [PERSON TEN] carried no firearms with him in Washington, D.C., however did carry a taser, with no cartridge as to be inline with District guidelines/laws. [PERSON TEN] was aware of two OKs working security who carried pepper spray, but was unsure of their names.

On page 6 of the 7 page interview 302, the Government knew on May 4, 2021, that:

However, when questioned, [PERSON TEN] advised if utilized, the purpose of the QRF would have been to evacuate "protectees", the injured, and/or assist in the extraction of OKs if attacked by ANTIFA or others. When asked about utilizing weapons or boats as part of a QRF, [PERSON TEN] advised it "wasn't us." When asked to clarify what he meant by "us", [PERSON TEN] advised neither he nor RHODES mentioned bringing weapons into Washington, D.C., or using boats in a QRF response. [PERSON TEN] added he heard about the QRF boat reference when he read it online in one of the affidavits.

On page 1 of the 6 page interview 302, the Government knew on May 25, 2021, that:

[PERSON TEN] was present for the November 2020 Million MAGA March in DC. [PERSON TEN] noted this was the event where everybody stayed at the farm outside of DC in Virginia. ~~Stewart Rhodes wanted to set~~ up security assistance for people as they left events and went to their cars, as the day before the march, Trump supporters were being attacked by Antifa. There was a Quick Reaction Force set up for the day of the event, and Rhodes placed Doug Smith in charge of the security. However, Smith was scared and did not want to go hands-on with Antifa without weapons, therefore Smith did not assist with the security at that event. This angered Rhodes and caused a falling out between Smith and Rhodes.

On page 2 of the 6 page interview 302, the Government knew on May 25, 2021, that:

In the week before January 5th, Rhodes called [PERSON TEN] and asked if he would set up security and protection for some of the speakers and politicians at the Jan 6 DC Event. [PERSON TEN] advised it was difficult to get people to help with the PSDs and stated that for a while on 1/5 he was the only one providing security at an event between the Capitol and the Supreme Court. At about 2-3pm that day, the Florida team, led by Kelly Meggs, showed up to help.

On page 3 of the 6 page interview 302, the Government knew on May 25, 2021, that:

2:15pm: *"The have taken ground at the capital." "We have to regroup any members who are not on mission".* [PERSON TEN] advised he was saying that things were getting bad there and people were starting to fight with the police and that [PERSON TEN] was trying to regroup the members to help with security for people who needed it and to regroup members to leave the area.

On page 5 of the 6 page interview 302, the Government knew on May 25, 2021, that:

After leaving the Capitol grounds, the group went back to the hotel then to the Olive Garden for dinner. Bentley did not want to go to the Olive Garden but agreed to go with [PERSON TEN]. At that time, [PERSON TEN] was still could not believe people went into the Capitol. At dinner, the group discussed a girl that was shot, what had happened that day and some vague discussion about veterans and Trump. At dinner, Rhodes spoke about how he wanted Trump to invoke the Insurrection Act, and how Rhodes wanted to be in for the long haul to assist Trump.

[PERSON TEN] advised he and Rhodes talked about the QRF and stated the QRF was not like those in a military mission or operation but was just about security and protection for people. [PERSON TEN] advised he had not seen the video from the QRF hotel with weapons but heard from SoRelle and Stewart about people having a stockpile of weapons there. [PERSON TEN] was asked about and advised he was acquainted with Paul Stamey, Rhodes' friend, but had not spoken with him since the first Trump march.

On page 5 of the 6 page interview 302, the Government knew on May 25, 2021, that:

[PERSON TEN] advised that was too much chatter on Signal for him to keep up with it and noted there were over 9,000 unread messages in one thread he was a part of. [PERSON TEN] advised once he knew there was an investigation, he retained all the messages he could in Signal. The messages that he could not keep were those that were set to auto-delete, where he did not have control to change the settings.

## II.   LEGAL STANDARD AND GOVERNING LAW

A defendant may not expressly waive his rights under the Speedy Trial Act. See, e.g., *United States v. Saltzman*, 984 F.2d 1087, 1090-1092 (10th Cir. 1993).

Criminal Resource Manual, U.S. Department of Justice, Article 628.  Speedy Trial Act of 1974,

accessible at: **https://www.justice.gov/archives/jm/criminal-resource-manual-628-speedy-trial-act-1974**

> Moreover, Rule 48, Fed. R. Crim. P., grants trial courts discretion to dismiss cases that are not brought to trial promptly. See Rule 48(b), Fed. R. Crim. P. (authorizing trial court to dismiss indictment if there is "unnecessary delay" in presenting the charge to a grand jury, in filing an information, or in bringing a defendant to trial).

*Id.*

The deprivation of the liberty of a person not convicted of any crime is such a serious matter that the Framers of the Constitution, including the first session of Congress which added the Bill of Rights:

> **The Eighth Amendment to the United States Constitution states:**
>
> **"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."**

Note that the constitution does _not_ say "Excessive _amounts_ of bail…" but its interpretation has been complicated and combined with Due Process:

> The Due Process Clause foresees eligibility for bail as part of "due process." See Salerno, supra, at 748–751, 107 S.Ct. 2095 ; Schilb v. Kuebel, 404 U.S. 357, 365, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971) ;  Stack v. Boyle, 342 U.S. 1, 4, 72 S.Ct. 1, 96 L.Ed. 3 (1951).  Bail is "basic to our system of law." Schilb, supra, at 365, 92 S.Ct. 479. It not only "permits the unhampered preparation of a defense," but also "prevent[s] the infliction of punishment prior to conviction." Stack, supra, at 4, 72 S.Ct. 1. It consequently limits the Government's ability to deprive a person of his physical liberty where doing so is not needed to protect the public, see Salerno, supra, at 750–751, 107 S.Ct. 2095 or to assure his appearance at, say, a trial or the equivalent, see Stack, supra, at 4–5, 72 S.Ct. 1. Why would this constitutional language and its bail-related purposes not apply to members of the classes of detained persons at issue here?
>
> The Eighth Amendment reinforces the view that the Fifth Amendment's Due Process Clause does apply. The Eighth

Amendment forbids "[e]xcessive bail." It does so in order to prevent bail being set so high that the level itself (rather than the reasons that might properly forbid release on bail) prevents provisional release. See *Carlson v. Landon*, 342 U.S. 524, 545, 72 S.Ct. 525, 96 L.Ed. 547 (1952) (explaining that the English clause from which the Eighth Amendment was copied was understood "to provide that bail shall not be excessive in those cases where it is proper to grant bail"). That rationale applies a fortiori to a refusal to hold any bail hearing at all. Thus, it is not surprising that this Court has held that both the Fifth Amendment's Due Process Clause and the Eighth Amendment's Excessive Bail Clause apply in cases challenging bail procedures. See, e.g., *Salerno, supra*, at 746–755, 107 S.Ct. 2095 ; *Carlson*, supra, at 537–546, 72 S.Ct. 525.

*Jennings v. Rodriguez*, 138 S. Ct. 830, 862, 200 L. Ed. 2d 122 (2018).

Of course, it is a rule of statutory interpretation to construe any statute consistently with the U.S. Constitution rather than to provoke a confrontation with the terms of the U.S. Constitution.  *See Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502, 514, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) ('Where fairly possible, courts should construe a statute to avoid a danger of unconstitutionality' (internal quotations omitted).)

Here, this Court is similarly obliged to interpret and apply the relevant statutes consistently with the Eighth Amendment to the U.S. Constitution, not to relegate the Constitutional command to a mere backdrop.

Similarly, in the Bill of Rights --

**The Sixth Amendment to the United States Constitution states:**

**"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."**

Every aspect of that Constitutional command has been violated by the U.S. Government with regard to Kelly Meggs, including (1) Kelly Meggs has been denied a speedy trial, (2) this Court by various judges have been denying Defendants a public trial on the concern that potential witnesses might listen to public access lines required due to COVID-19, whereas witnesses are pretty much always on the honor system not to talk to each other or to parties, (3) Kelly Meggs has been denied the ability to obtain witnesses in his favor by the flagrant and rampant disobedience of the U.S. Government to the constitutional force of *Brady v. Maryland* by ignoring Meggs' requests for his smart phone to be returned, information about who has information within the U.S. Government (leading to whom to call as witnesses at trial), while dumping a tsunami of irrelevant junk upon the Defendants and calling that disclosure, (4) Kelly Meggs is not accused of committing any violence or property damage or other harm within the District of Columbia but of allegedly conspiring from within the State of Florida, such that the alleged crime of conspiracy occurred primarily in Florida, (5) the Courts and Congress have repeatedly smeared the Defendants before the prospective jurors of the District of Columbia, including the presiding judge in this case and most other judges of this District openly declaring the Defendants to be guilty before their trials have started. [6]

---

[6]     See, as one example, Pages 2-3 of the Opinion and Order upon various Motions to Dismiss entered by the Honorable Judge Amit Mehta, in *Bennie J. Thompson v. Donald J. Trump, et al,* Case 1:21-cv-00400-APM (ECF # 66, February 18, 2022) (consolidated with other cases) publicly declaring without the qualification explaining to the public that these are the allegations of the ~~Plaintiffs, but presenting before~~ a single witness has testified or any evidence presented what actually happened.  Predictably, the jury pool in D.C. was once again saturated with news that another Judge of the U.S. District Court for the District of Columbia had proclaimed all of the Defendants still awaiting trial to be guilty in advance of any testimony, witnesses, or evidence at trial.  The Opinion once again claims that five people died, knowing by then that five police officers died of natural causes.  The Opinion tells the public that "The President then directed the thousands gathered to march to the Capitol—an idea he had come up with himself." even though the information

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *United States v. Salerno*, 481 U.S. 739, 755 (1987); *see also United States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018) ("The default position of the law . . . is that a defendant should be released pending trial." (internal quotation marks and citation omitted)); *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) ("[F]ederal law has traditionally provided that a person arrested for a non-capital offense shall be admitted to bail.  Only in rare circumstances should release be denied.  Doubts regarding the propriety of release should be resolved in favor of the defendant." (internal citations omitted)).

The Bail Reform Act of 1984 authorizes one of those carefully limited exceptions.

Relevant here, the government may seek a defendant's pretrial detention if it has charged an offense falling within one of five enumerated categories.  *See* Mem. Op., *United States v. Chansley*, No. 21-cr-00003-RCL, at 8 (D.D.C. March 8, 2021) (quoting 18 U.S.C. § 3142(f)(1)). Assuming the court finds that the defendant has been charged with such an offense, the court "shall order" a defendant detained before trial if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'"  *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

"The crux of the constitutional justification for preventative detention under the Bail Reform Act is that, '[w]hen the Government proves by clear and convincing evidence that an arrestee presents an *identified and articulable threat* to an individual or the community, . . . a ~~court may disable the arrestee~~ *from executing that threat.*'"  *United States v. Munchel*, 2021 U.S. App. LEXIS 8810, at *13 (D.C. Cir. March 26, 2021) (emphasis added) (*quoting Salerno*, 481

known is that the permits for six (6) demonstrations on the U.S. Capitol Grounds were actually is-sued by the U.S. Capitol Police in December, before it was decided that Trump would speak at the 100% peaceful, 100% lawful, and 100% constitutionally protected rally at the Ellipse.

U.S. at 751).  "Therefore, to order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community," *id.* at *19, and "a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety."  *Id.* at *13.

Then, only after the government has met its burden of proving a specific articulable threat to an individual or the community, the government must establish, again by clear and convincing evidence, "that *no* condition or combination of conditions will reasonably assure the safety of any other person and the community," 18 U.S.C. § 3142(f)(2), or, in other words, that pretrial detention is the *only* means by which the safety of the community can reasonably be assured. *See United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996).

Under 18 U.S.C. § 3145(b), a defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment to the order" with "a court having original jurisdiction over the offense."  This court has previously held that a magistrate judge's detention order is subject to *de novo* review by the district court.  *See United States v. Taylor*, 289 F. Supp. 3d 55, 63 (D.D.C 2018).[1]

### III.   THE BAIL REFORM ACT DOES NOT AUTHORIZE KELLY MEGGS'S PRETRIAL DETENTION.

Because the government has neither charged Kelly Meggs with a "crime of violence" nor with a felony that involves the possession or use of a "dangerous weapon," the government is not entitled to seek the detention of Kelly Meggs pending a trial in this matter.  Moreover, even if the government was entitled to a detention hearing, the government has failed to prove, by clear and

---

[1] Although the Circuit Court for the District of Columbia has not expressly ruled on this issue, it has acknowledged in dictum, in a case arising under the predecessor Bail Reform Act that district courts review such prior determinations with "broad discretion."  *Wood v. United States*, 391 F.2d 981, 984 (D.C. Cir. 1981).

convincing evidence, that Kelly Meggs poses a dangerous threat to his community.  And even if the government has met its burden, it has nevertheless failed to demonstrate, again by clear and convincing evidence, that no condition, or combination of conditions, could reasonably assure the safety of the community.

**A.**  The Charged Offenses Do Not Authorize Kelly Meggs's Detention.

At the outset, pretrial detention is only available in a limited subset of cases involving "the most serious" of offenses.  *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) (*quoting Salerno*, 481 U.S. at 739); *Singleton*, 182 F.3d at 14 (describing burglary as the "classic example of an offense evidencing such a direct relationship" – "[t]he risk of violence in a burglary is not merely temporally coincident with the offense, but arises from the actions of the burglar in committing the crime itself, and the likely consequences that would ensue upon intervention of another person").

Thus, as a threshold determination, this Court must first find that the government is entitled to a detention hearing (let alone detention).  *See* 18 U.S.C. § 3142(f).  Applicable here, the government seeks pretrial detention pursuant either to 18 U.S.C. § 3142(f)(1)(A), because Kelly Meggs is accused of committing a "crime of violence," or 18 U.S.C. § 3142(f)(1)(E), because he is accused of committing a felony "that involves the possession or use . . . of a dangerous weapon." Specifically, Kelly Meggs has been indicted on eight (8) counts, of which 3 (three) are contended to be crimes of violence[2] and in just one has the grand jury alleged the use of a dangerous weapon. Indictment (March 19, 2021) (ECF No. 12).

---

[2] In prior proceedings, the government has asserted that cases involving 18 U.S.C. § 231(a)(3) (Civil Disorder); § 1512(c)(2) (Obstruction of an Official Proceeding); § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds); § 1752(a)(2) (Disorderly and Disruptive Conduct in Restricted Building or Grounds) are not "crime[s]

>    ***i.*** Kelly Meggs Has Not Been Charged with a "Crime of Violence."

A "crime of violence" includes "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another" or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  18 U.S.C. § 3156(a)(4).[3]

"In determining whether an offense is a crime of violence, courts look to the elements of the offense, not the real world conduct."  *Singleton*, 182 F.3d at 11.  "The term of art 'element of the offense' makes clear that a court need look no further than the statute creating the offense to decide whether it describes a crime of violence."  *Id.* at 11; *see also Mathis v. United States*, 136

S. Ct. 2243, 2250 (2016) (explaining that an "element" is something that the jury has to unanimously select or something the defendant must necessarily admit to be found guilty of the offense).  A statute cannot categorically be a "crime of violence" unless "the least of the acts criminalized" has as an element the "use, attempted use, or threatened use of physical force."  *Montcrieffe v. Holder*, 569 U.S. 184, 191 (2013); 18 U.S.C. § 3156(a)(4).

The principal of ejusdem generis is instructive in considering which offenses Congress intended to give rise to a detention hearing.  Specifically, "a general statutory term [is] understood in light of the specific terms that surround it."  *Hughey v. United States*, 495 U.S. 411, 419 (1990), *quoted in United States v. Watt*, 911 F.Supp. 538, 545 n.5 (D.C. Cir. 1995).  For

---

of violence" warranting a detention hearing.  *See* Opp. Mot. Pretrial Release, *United States v. Chansley*, No. 21-cr-3- RCL, at 2 n.2 (March 1, 2021).  Nor can § 5104(e)(2)(D) be seriously considered a "crime of violence."  That section requires, *inter alia*, only a finding that the accused "utter loud, threatening, or abusive language."

[3] Section 3156(a)(4) also defines a "crime of violence" as any felony listed under chapter 77, 109A, 110, or 117, however it is undisputed that Kelly Meggs has not been charged with any such offense.

example, under section 3142(f)(1)(A), in addition to cases involving "crime[s] of violence," the government is entitled to a detention hearing where the defendant is charged with sex trafficking of children under 18 U.S.C. § 1591, or with a "Federal crime of terrorism" under 18 U.S.C. § 2332b(g)(5)(B).  In addition, the government is entitled to a detention hearing when the defendant is charged with an offense for which the maximum sentence is life imprisonment or death.  *See* 18 U.S.C. § 3142(f)(1)(B).  A review of the *elements* of the offenses with which Kelly Meggs has been charged confirm that they are not among "the most serious" of offenses intended to captured by Congress with its passage of the Bail Reform Act.

Specifically, [t]he . . . question is whether the 'nature' of an offense . . . is such that a 'substantial risk' of violence arises 'in the course of committing the offense.'" *United States v. Singleton*, 182 F.3d 7, 10 (D.C. Cir. 1999).  "Case-specific facts are thus relevant at a detention hearing, but not when considering the government's motion . . . to hold such a hearing." *Id.* at 12.  "Absent a direct relationship between the offense and a risk of violence, the *possibility* of violence is not a basis for pretrial detention on a charge that on its face does not involve violence as an element." *Id.* at 14.  "[A] more precise relationship between charged conduct and future risk is necessary to," *id.*, demonstrate that an offense "involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 3156(a)(4)(B).[4]

---

[4] As the D.C. Circuit recognized in *Singleton*, the fact that a charged offense does not entitle the government to a detention hearing "does not deprive the government of an opportunity to detain [the accused] when other circumstances warrant." 182 F.3d at 16.  The Court goes on to note that the government can seek pretrial detention if the accused presents a flight risk or otherwise a risk "that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror,"

18

U.S.C. § 3142(f)(2), circumstances the government has not alleged here.

bodily injury is likely inflicting bodily injury. And "[a]bsent a direct relationship between the

offense and a risk of violence, the possibility of violence is not a basis for pretrial detention on a

charge that on its face does not involve violence as an element." *Singleton*, 182 F.3d at 14

(describing burglary as the "classic example of an offense evidencing such a direct relationship"

– "[t]he risk of violence in a burglary is not merely temporally coincident with the offense,

but arises from the actions of the burglar in committing the crime itself, and the likely

consequences that would ensue upon intervention of another person").

Committing an assault that inflicts bodily injury does not require the government to prove

that the defendant used force against the person. This is so because the mere fact that offense

*results* in injury, is not the equivalent of the use of violent force. Not to recognize the distinction

between a *use* of force and a *result* of injury is not to recognize the "logical fallacy . . . that simply

because all conduct involving a risk of the use of physical force also involves the risk of injury

then the converse must also be true." *Dalton v. Ashcroft*, 257 F.3d 200, 207 (2d Cir.

2001); *see also cf. United States v. Williams*, 353 F. Supp. 3d 14, 21 (D.D.C. 2019) ("To

be sure, involuntary manslaughter always results in death. But offenses resulting in death do not

necessarily require the use of violent force").

1. <u>Neither 40 U.S.C. § 5104(e)(2)(F) Nor 18 U.S.C. §</u>

<u>1752(a)(4) Constitute "Crimes of Violence."</u>

Section 5104(e)(2)(F) of Title 40 of the United States Code provides that an individual

"may not willfully and knowingly . . . engage in an act of physical violence in the Grounds or any

of the Capitol Buildings . . . ." Similarly, section 1752(a)(4) of Title 18 of the United States Code

precludes "knowingly engag[ing] in any act of physical violence against any person or property in any restricted building or grounds," including "a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."  "An act of physical violence" is defined by section 5104 as an "act involving – (A) an assault or other infliction or threat of infliction of death or bodily harm on an individual; or (B) damage to, destruction of, real or personal property."  40 U.S.C. § 5104(a)(1).

Once again, a statute cannot categorically be a "crime of violence" unless "the least of the acts criminalized" has as an element the "use, attempted use, or threatened use of physical force." *Montcrieffe v. Holder*, 569 at 191; 18 U.S.C. § 3156(a)(4).  Thus, all a jury need find to convict a defendant of an offense under section 5104(e)(2)(F), is an assault – and "inflicting bodily injury on or otherwise causing bodily injury to a person . . . need not connote violence," *Bennett*, 863 F.3d at 681 – *or* damage to real or personal property, which also need not connote violence.  *See United States v. Bowen*, 936 F.3d 1091, 1107-08 (10th Cir. 2019) ("Although spray-painting another's car damages that person's property, we cannot conclude that the *mere* fact that it damages property means that it requires 'violent force,' or makes it a crime of violence ........" (*quoting (Curtis) Johnson*, 559 U.S. at 140)).

The government has not alleged that Kelly Meggs committed any offense, let alone a felony, involving the possession of a "dangerous weapon" and therefore he may not be detained pending trial pursuant to section 3142(f)(1)(E).

> B. The Government Has Failed to Establish Any Articulable Threat Posed by Kelly Meggs to an Individual or the Community.

Even if the government is entitled to a detention hearing, it has failed to prove, by clear and convincing evidence, that Kelly Meggs poses an articulable threat to an individual or the

community.  The crux of the constitutional justification for preventative detention under the Bail

Reform Act is that '[w]hen the Government proves by clear and convincing evidence that an

arrestee presents an identified and articulable threat to an individual or the community, . . . a court

may disable the arrestee from executing that threat." *Munchel*, 2021 U.S. App. LEXIS 8810, at

*16 (*quoting Salerno*, 481 U.S. at 751).  "Therefore, to order a defendant preventatively detained,

a court must identify an articulable threat posed by the defendant to an individual or the

community," *id.* at 16-17, and "a defendant's detention based on dangerousness accords with due

process only insofar as the district court determines that the defendant's history, characteristics,

and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to

public safety."  *Id.* at 11.

 In assessing whether pretrial detention is warranted for dangerousness, the district court

considers four statutory factors:  (1) "the nature and circumstances of the offense charged;" (2)

"the weight of the evidence against the person;" (3) "the history and characteristics of the person;"

and (4) "the nature and seriousness of the danger to any person or the community that would be

posed by the person's release."  18 U.S.C. § 3142(g)(1)-(4).

 Additionally, "[d]etention cannot be based on a finding that the defendant is unlikely to

comply with conditions of release absent the requisite finding of dangerousness or risk of flight;

otherwise the scope of detention would extend beyond the limits set by Congress."  *Munchel*, at

17.  Rather, the government must "clearly identif[y]" an "articulable threat."  *Id.*  "Thus, a

defendant's detention based on dangerous accords with due process *only insofar* as the district

court determines that the defendant's history, characteristics, and alleged criminal conduct

make clear that he or she poses *a concrete, prospective threat to public safety.*"  *Id.* at 11.  This

holding of the D.C. Circuit is consistent with the Supreme Court's acknowledgement in *Salerno* that while constitutional on its face, the Bail Reform Act could nevertheless be unconstitutionally applied. *Salerno*, 481 U.S. at 745 n.3. Kelly Meggs's detention in this case is exactly the unconstitutional application of the Bail Reform Act contemplated by the Court in *Salerno*. Where, as here, a defendant is detained based solely on the conduct they are alleged to have committed (and absent a charge giving rise to a presumption of detention), the failure of the government to "clearly articulate" a future threat to an individual or the community constitutes a deprivation of that defendant's due process rights under the Fifth Amendment of the Constitution. *See*, *e.g., Motamedi*, 767 F.2d at 1405 (The Fifth and Eighth Amendments' prohibitions of deprivation of liberty without due process and of excessive bail require careful review of pretrial detention orders to ensure that the statutory mandate has been respected.").

*i.* Nature and Circumstances of the Charged Offenses

Judge Howell has delineated several factors that she has considered in evaluating the nature and circumstances of charged offenses as part of the government's request for detention in Capitol violence cases. *See* Mem. Op., *United States v. Chrestman*, No. 1:21-cr-00160-TJK, at 14-16 (D.D.C. Feb. 26, 2021). The "differentiating factor[s]" include: (1) "whether a defendant has been charged with felony or misdemeanor offenses;" (2) "any indication that a defendant engaged in prior planning before arriving at the Capitol;" (3) whether a defendant is alleged to have been equipped with a dangerous weapon "indicat[ing] at least some degree of preparation for the attack and an expectation that the need to engage in violence against law enforcement or, indeed, the Legislative branch, might arise;" (4) "[e]vidence of coordination with other participants before,

during, or after the riot"; (5) evidence that a "defendant . . . assumed either ra formal or a de facto leadership role;" (6) "a defendant's words and movements during the riot" including, but not limited to, whether a defendant (i) "injured, attempted to injure, or threatened to injure others;" (ii) "actively threatened or confronted federal officials or law enforcement;" and/or (iii) "promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot, thereby encouraging others to engage in such conduct." *Id.*

It is axiomatic that the Bail Reform Act does not contemplate detention based purely on the nature of pending charges alone: to do so would unconstitutionally controvert one's presumption of innocence by requiring detention based solely on the allegations giving rise to the need for a detention hearing and not the facts *and circumstances* requiring contemplation by the plain language of the statute itself. *See*, *e.g.,* 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence.").

Nevertheless, Judge Howell's delineation of factors, while not binding on this court's determination, do reflect her participation in a number of detention hearings relating to the violence at the Capitol on January 6. And with respect to Kelly Meggs, the government has not proffered any evidence, let alone admissible evidence, that he "engaged in prior planning before arriving at the Capitol" or "coordin[ated] with other participants before, during or after the riot;" that he brought a dangerous weapon with him to the Capitol evincing "some degree of preparation for the attack and an expectation that the need to engage in violence against law enforcement;" or that he ever entered the Capitol or was otherwise present at the events of January 6, except for the 30 minutes described by the government in their Complaint.

And while Kelly Meggs has been charged with a felony, this one factor cannot, and should not alone warrant his detention pending trial. Moreover, although the government alleges Kelly

Meggs was "calling back to the crowd behind him," the government does not allege that the person depicted in the video in any way commanded authority or otherwise served in any leadership role. The shouts of many can be heard during the events of January 6 and while condemnable, in the words of Judge Howell herself, "not all rioters charged with offenses stemming from the January 6 attack will be held pending trial." Mem. Op., *United States v. Chrestman*, No. 1:21-cr-00160-TJK, at 13 (D.D.C. Feb. 26, 2021).

The government also proffers that Kelly Meggs "engag[ed] in hand-to-hand violence against police officers while wielding an apparently stolen police riot shield," Memo. in Support of Pretrial Detention, at 5 (ECF No. 10), but the only evidence proffered of this incident is that Kelly Meggs "shoved a riot shield . . . towards the officers trying to stop the mob from gaining access to the building [and] [i]n doing so, . . . pushed the riot shield in between the doors to the Capitol." Complaint, at 6 (ECF No. 1). To be sure, the allegation is serious, but does not depict "hand-to- hand" conduct or nor any legitimate belief that the person depicted actually assaulted an officer, as opposed to blocking the door. Indeed, as the only party in possession of the body worn camera purportedly depicting the events described in the complaint, surely the government would have alleged some alleged physical contact between the person they assume is Kelly Meggs and an officer. Therefore, it cannot fairly be said that Kelly Meggs is alleged to have either "injured, attempted to injure, or threatened to injure others;" or that he is alleged to have "actively threatened or confronted federal officials or law enforcement." And the government has not proffered any evidence of Kelly Meggs having "promoted or celebrated efforts to disrupt the certification of the electoral vote count."[12] Mem. Op., *United States v. Chrestman*, No. 1:21-cr-00160-TJK, at 15 (D.D.C. Feb. 26, 2021).

In summary, while the government passionately recounts the events of January 6 in its pretrial detention memorandum, the government also betrays its own bias by speculating as to Kelly Meggs's motives, asserting that "[Mr.] Klein chose to unlawfully enter the Capitol Grounds on January 6, 2021, for the stated purpose of preventing Congress from completing its constitutional duty of certifying the results of a lawful election." Mem. in Support of Pretrial Detention, at 8 (March 9, 2021) (ECF No. 10). In reality, any suggestion of nefarious motive is contradicted by the government's own acknowledgement that the person alleged to be Kelly Meggs is also captured on video *helping* officers at the Capitol. *See* Complaint, at 13-14 (ECF No. 1).

---

[12] In its Detention Memorandum, the government alleges that Kelly Meggs can heard yelling "we just want a fair election," but this statement, on its own, cannot credibly be said to "promot[e]" or "celebrate" an effort to stop the election certification.

### ii. The Purported Weight of the Evidence.

In determining whether conditions of release can assure the safety of others, "[t]he weight of the evidence is the least important of the factors and the bail statute neither requires nor permits a pretrial determination of guilt." *United States v. Gebro*, 948 F.2d 1118, 1121-22 (9th Cir. 1991) (citing *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986)); *see also Motamedi*, 767 F.2d at 1408 ("It is apparent from the record below that the district court accorded great weight to the charges against [the defendant] and the Government's assertions of his guilt."). "[I]f the court impermissibly makes a preliminary determination of guilt, the refusal to grant release could become in substance a matter of punishment." *Motamedi*, 767 F.2d at 1408. "It is not the purpose of the bail system to punish an accused again for his past crimes, *or to punish him in advance for crimes he has not yet been shown to have committed.*" *United States v. Alston*, 420 F.2d 176, 179

(D.C. Cir. 1969) (emphasis added).

> It is true of course, that [the predecessor to the current Bail Reform Act] requires the court to take into account 'the nature and circumstances of the offense charge [and] the weight of the evidence against the accused,' but the statute neither requires nor permits a pretrial determination that the defendant is guilty.  This is not merely a matter of the proprieties, though that is itself not unimportant for judicial actions.  If one bears in mind that one is examining only the evidence against the accused, for purposes of considering prospect of flight[,] [then, the only basis for detention], one is more likely to guard against the impermissible course of reaching some kind of partial determination of guild and beginning what is in substance a mandate of punishment.

In addition, the government relies upon an identification of Kelly Meggs by a former colleague at the Department of State, without providing any information as to the methods or procedures utilized in obtaining the identification.  *See* Memo. in Support of Pretrial Detention, at 10 (March 9, 2021) (ECF No. 10).

The irony of the readily apparent weaknesses in the government's proof is exacerbated by the government's procedural approach in this and related matters.  Although it filed its criminal complaint against Kelly Meggs on March 2, 2021, resulting in his March 4, 2021 arrest and subsequent detention, the government did not file an indictment against Kelly Meggs with the Court until March 19, 2021, the same day Kelly Meggs was scheduled for a preliminary hearing at which time he would have had his first opportunity to explore the weaknesses articulated above.

Weaknesses this Court is now precluded from relying upon in reaching a pretrial detention determination.  Moreover, the government has yet to produce any discovery in this

matter, despite Kelly Meggs's request for the same on March 14, 2021.  "No one may be confined

on the ground that he has committed an offense when the determination is void of the protections

that are the essentials of the Anglo-American jurisprudence." *Alston*, 420 F.2d at 179.

### iii.  History and Characteristics of the Defendant

In considering Kelly Meggs's history and characteristics, the Court must "take into

account the available information concerning" Klein's "character, physical and mental condition,

family ties, employment, financial resources, length of residence in the community, community

ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record

concerning appearance at court proceedings."  18 U.S.C. § 3142(g)(3)(A).

Specifically, Kelly Meggs has strong ties to the area in which he resides, having lived in

the Dunellon, Florida area his entire life,

### iv.  Danger to the Community

The final factor that the Court must consider is "the nature and seriousness of the danger to

any person or the community that would be posed by the defendant's release."  18 U.S.C. §

3142(g).  "Consideration of this factor encompasses much of the analysis set forth above, but it is

broader in scope," requiring an "open-ended assessment of the 'seriousness' of the risk to public

safety." *Taylor*, 289 F. Supp. 3d at 70.  Because this factor substantially overlaps with the ultimate

question of whether any conditions of release "will reasonably assure . . . the safety of any other

person and the community," 18 U.S.C. § 3142(e), it should bear heavily on the Court's analysis.

*See* Memorandum Opinion and Order, *United States v. Cua*, No. 21-107 (RDM) (March 10, 2021).

The government bears the ultimate burden of establishing that no condition or combination

of conditions is sufficient to negate the risk of the accused's dangerousness by clear and

convincing evidence.  18 U.S.C. § 3142(e)(1); *see also United States v. Bell*, 209 F. Supp. 3d 275,

277 (D.D.C. 2016) (*citing United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987)).

Clear and convincing evidence means proof that the defendant actually poses a danger to the community, not that a defendant "in theory" poses a danger.  *United States v. Patriarca*, 948 F.2d 789 (1st Cir. 1991).  Only when there is a "strong probability that a person will commit additional crimes if released" is the community interest in safety sufficiently compelling to overcome the criminal defendant's right to liberty.  *United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988).

In passing the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*, Congress hoped to "give the courts adequate authority to make release decisions that give appropriate recognition to the danger *a person* may pose to others if released."  S. Rep. No. 98-225, at 3.

> The reference to safety of any person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community.

S.Rep. No.98-225 at 12–13, reprinted in 1984 U.S. Code Cong. & Adm. News 3182, 3195–3196, *quoted in* 3B Wright & Miller, Fed. Prac. & Proc. § 766 (4th ed.).

To that end, in *United States* v. Salerno, 481 U.S. 739 (1987), the Supreme Court held that "the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment" and that a valid regulatory purpose of pretrial detention is to "give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released."  *Id.* at 742 (quotation omitted).  Yet, the Court explicitly acknowledged the possibility of the Bail Reform Act *being applied* in a manner

constituting an unconstitutional violation of an accused's due process rights ensured by the Fifth Amendment. *See id.* at 745 n.3.

In that vein, the D.C. Circuit has now explicitly articulated the unique confluence of events that gave rise to the violence at the Capitol on January 6 and has admonished this court for:

> Fail[ing] to demonstrate that it considered the specific circumstances that made it possible, on January 6, for [those gathered] to threaten the peaceful transfer of power. [Those gathered] had a unique opportunity to obstruct democracy on January 6 because of the electoral college vote tally taking place that day, and the concurrently scheduled rallies and protests. Thus, [participants in the violence at the Capitol] were able to attempt to obstruct the electoral college vote by entering the Capitol together with a large group of people who had gathered at the Capitol in protest that day.      [T]he presence of the group was critical to [the] ability to
>
>       obstruct the vote and to cause danger to the community.

*Id.* at 19-20. The D.C. Circuit went on to note that although the district court concluded the defendants there were "a danger to 'act against Congress' in the future," it failed to "explain[] how the [defendants] would be capable of doing so now that the specific circumstances of January 6 have passed." *Id.* at 19-20.

In ordering Kelly Meggs detained pending trial, the magistrate judge concluded: "That the Capitol grounds are currently heavily fortified and prepared for future incursions reflects that leaders have ascertained that a risk still exists for future violent conduct." Order, at 11 (March 16, 2021) (ECF No. 11). Put differently, the sole grounds upon which the Court relied in concluding Kelly Meggs presents "an identified and articulable threat to an individual or the community" is

the fact that he is alleged to have participated in the events of January 6.

In so doing, the court shifted "the Government's burden to prove to the judicial officer by clear and convincing evidence that 'no condition or combination of conditions will reasonably assure the safety of any person and the community." *United States v. Watkins*, 940 F.3d 152,159 (2d Cir. 2019).  Absent an "articulable threat" of future acts against Congress by Kelly Meggs now that the specific circumstances of January 6 have passed, the government has failed to meet its burden, by clear and convincing evidence, that Kelly Meggs poses a danger to any individual or to the community and his detention is permitted neither by the Bail Reform Act, nor the due process clause of the Fifth Amendment to the Constitution.

Absent any specifically articulable threat posed by Kelly Meggs to his community pretrial detention is unwarranted.  Indeed, notably absent from the detention order is any reference to the fact that the government does not allege that Kelly Meggs made any attempt to flee, but rather between January 7 and his arrest evidently lived his life normally – including working or seeking work, attending church, and otherwise living his life normally.  The only reasonable inference to be drawn from the court's detention order is that to be released, Kelly Meggs would have had to prove that he did not participate in the conduct he is now merely alleged to have committed.

C.  Conditions of Release Ensure that the Public's Safety Can be Reasonably Assured.

Even were this court to conclude that Kelly Meggs presents an articulable threat to an individual or the community, it must nevertheless assess whether "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  The condition or combination of conditions need not guarantee the safety of the community, to so require would "fly in the teeth of Congress's clear intent that only a limited number of defendants be subject to pretrial detention."  *United States v. Tortora*, 922 F.2d

880, 884 (1st Cir. 1990) (internal citation omitted).  Rather, courts cannot demand more than an "objectively reasonable assurance of community safety."  *United States v. Orta*, 760 F.2d 887, 891-92 (8th Cir. 1985), *quoted in Tortora*, 922 F.2d at 884.

Because the government has yet to articulate a specific threat to the community it is difficult, if not impossible, to understand how the panoply of release conditions, including GPS monitoring, available to the court would not assure the safety of the community.  Particularly concerning is the rationale of Magistrate Judge Faruqui in ordering Kelly Meggs's detention:

> "It still appears that the security of the Capitol Building hangs in the balance.  The only reason there have been no additional attacks is because there has been a military defense put up around these buildings – short of an invading force.  This seems to indicate to me, including recently amid heightened, concerns that there continues to be a threat.  Given that case, there is not an inchoate danger, a real danger of violence."

Of course, this rationale for detention has now been rebuffed by the D.C. Circuit and, absent some specifically articulable threat posed by Kelly Meggs, it is axiomatic that the safety of the community can reasonably be assured despite Kelly Meggs's release.

### IV.    TOLLING THE SPEEDY TRIAL ACT WHILE ORDERING THE INDEFINITE DETENTION OF KELLY MEGGS DENIES JUSTICE.

In addition to demanding Kelly Meggs's pretrial detention, the government now seeks to vitiate Kelly Meggs's constitutional right to a speedy trial.  Not only does the government fail to articulate a legitimate basis for why the ends of justice are served by granting the continuance it seeks, but the combination of insisting on Kelly Meggs's pretrial detention while not being able

afford Kelly Meggs a speedy trial constitutes a violation of his due process rights

**A.** The Government is Not Entitled to Exclude Time Under the Speedy Trial
Act.

Section 3161 of Title 18 of the United States Code requires that a trial commence within

seventy (70) days from the filing date of an information or indictment, or from the date a

defendant first appears before a judicial officer of the court in which the charge is pending,

whichever is later.  18 U.S.C. § 3161(c)(1).  "A criminal defendant's right to a speedy trial is 'one

of the most basic rights preserved by our Constitution."  *Klopfer v. North Carolina*, 386 U.S. 213,

226 (1967).  Congress chose to safeguard this important right through the rigid procedural

requirements of the Speedy Trial Act."  *United States v. Ammar*, 842 F.3d 1203, 1212-13 (2016).

The Speedy Trial Act excludes certain periods of time for purposes of computing the time

within which a trial must commence, including where the trial court makes a finding that the  ends

of justice outweigh the defendant's and the public's interest in a speedy trial.  18 U.S.C. §

3161(h)(7)(A).  The government contends that "[t]he investigation and prosecution of the Capitol

Attack will likely be one of the largest in American History, both in terms of the number of

defendants prosecuted and the nature and volume of the evidence."  Mot. Continue, at 2 (March

25, 2021) (ECF No. 15).  That "[o]ver 300 individuals have been charged in connection with the

Capitol Attack" and that it "expects that at least one hundred additional individuals will be

charged."  *Id.*

The government goes on to describe the voluminous evidence it has collected or

anticipates collecting.  *Id.* at 3.  Yet, despite the hurdles the government anticipates facing in the

production of discovery in *this* case, the government managed to present evidence to a grand jury

just over two weeks after Kelly Meggs was arrested in this matter.

30

Here, "[t]he government chose when to bring this prosecution, with the understanding that each *individual* defendant has rights under the Speedy Trial Act," that "[t]wo months after it brought forth the initial prosecutions in this case, the government has yet to determine how it can deliver discovery," and that "[t]he government chose to prosecute [these cases] when it had no plan to [do so] within the restrictions of its discovery obligations." Opp. Mot. Exclude, *United States v. Gerding*, No. 1:21-cr-000131-PLF, at 3-4 (D.D.C. March 16, 2021). *But see* Mot. Exclude, at 3 (March 25, 2021) (ECF No. 15) ("The United States is aware of and takes seriously its obligations pursuant to Federal Rule of Criminal Procedure 16 and Local Criminal Rule 5.1(a), the provisions of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *Giglio v. United States*, 405 U.S. 150, 153-54 (1972), and the Jencks Act, 18 U.S.C. § 3500.").

The government's request is also readily distinguishable from, for example, the District-wide Standing Order excluding time from Speedy Trial Act calculations in all criminal cases "that cannot be tried consistent with [] health and safety protocols and limitations." Standing Order No. 21-10 (BAH) (Mar. 5, 2021); *see also* Order, *United States v. Talyor*, No. 18-001918, 2020 U.S. Dist. LEXIS 232741, at *23 (D.D.C. Dec. 10, 2020) ("[T]he realities of the present pandemic ensure that the ends of justice served by a continuance decidedly outweigh the interests of [the defendant] and the public in a speedy trial."). Here, the delay is not caused by the unknown time before which we can gather safely to prosecute and defend criminal cases, but by the government's concession that it is overwhelmed by the volume of evidence in *this* case.

**B.** Insisting on Kelly Meggs's Detention Based Solely on the Allegations with which he is Charged while Simultaneously Denying his Right to a Speedy Trial Deprives Kelly Meggs of his Due Process Rights Guaranteed by the Fifth Amendment to the Constitution.

The government's request is especially unjust where, as here, it has insisted upon the

pretrial detention of a defendant knowing that it knows not when Kelly Meggs can reasonably anticipate to exercise his right to a trial by jury.

To be sure, the Supreme Court has acknowledged the legitimate regulatory goal of solving a pressing societal problem – curbing an increase in violent crime by defendants released pending trial – subject to the implementation of "extensive safeguards" intended to provide "procedural protection" to defendants. *Salerno*, 481 U.S. at 752.  But the Court in *Salerno* also recognized that while constitutional on its face, the Bail Reform Act could nevertheless be unconstitutionally applied. *Salerno*, 481 U.S. at 745 n.3.  The confluence of circumstances with which this Court is presented – a recipe of the government's making – is exactly the unconstitutional application of the Bail Reform Act contemplated by the Supreme Court in *Salerno*.  Where, as here, a defendant is detained based solely on the conduct they are alleged to have committed, the failure of the government to "clearly articulate" a future threat to an individual or the community combined with a request by the government to deprive the defendant of their right to speedy trial under the Sixth Amendment constitutes a deprivation of that defendant's due process rights under the Fifth Amendment of the Constitution.

The government cannot have it both ways – insist on the detention of Kelly Meggs based solely on the allegations with which he is charged while concomitantly refusing to provide *any* certainty regarding when Kelly Meggs can expect to exonerate himself by a jury of his peers.

CONCLUSION

Kelly Meggs has now been detained over a year based solely on the government's allegation that _someone else_ committed violence that occurred at the Capitol Building on January 6. Because the government was not statutorily entitled to a detention hearing in this case; because

the government has failed to articulate a specific threat to the community posed by Kelly Meggs

or that no condition or combination of conditions of release would reasonably assure such safety;

or because, in the alternative, detaining Kelly Meggs while simultaneously depriving Kelly Meggs

the right to a Speedy Trial would violate his due process rights, the Court must Order Kelly

Meggs's release subject to any conditions the Court deems necessary to assure the safety of his

community.


Dated:  April 7, 2022           RESPECTFULLY SUBMITTED
                                     KELLY MEGGS, *By Counsel*

Jonathon A. Moseley, Esq.

USDCDC Bar No. VA005
Virginia State Bar No. 41058
Mailing address only:
5765-F Burke Centre Parkway, PMB #337
Burke, Virginia 22015
Telephone:  (703) 656-1230
**Contact@JonMoseley.com**
**Moseley391@gmail.com**

Jonathon Moseley, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2022, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following CM/ECF participants.  From my review of the PACER / ECF docket records for this case that the following attorneys will receive notice through the ECF system of the U.S. District Court for the District of Columbia.

**Jeffrey S. Nestler**
U.S. ATTORNEY'S OFFICE
555 Fourth Street NW
Washington, DC 20530
202-252-7277
**jeffrey.nestler@usdoj.gov**

**Kathryn Leigh Rakoczy**
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252-6928
(202) 305-8537 (fax)
**kathryn.rakoczy@usdoj.gov**

**Justin Todd Sher**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530
202-353-3909
**justin.sher@usdoj.gov**

**Troy A. Edwards, Jr**
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 4th Street, NW
Washington, DC 20001
202-252-7081
**troy.edwards@usdoj.gov**

**Alexandra Stalimene Hughes**
DOJ-Nsd
950 Pennsylvania Ave NW
Washington DC, DC 20004
202-353-0023
**Alexandra.Hughes@usdoj.gov**

**Louis J. Manzo**
DOJ-CRM
1400 New York Ave NW
Washington, DC 20002
202-616-2706
**louis.manzo@usdoj.gov**

**Ahmed Muktadir Baset**
U.S. ATTORNEY'S OFFICE
United States Attorney's Office for the District of Col
555 Fourth Street, N.W., Room 4209
Washington, DC 20530
202-252-7097
**ahmed.baset@usdoj.gov**

Jonathon Moseley, Esq.