## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| | )) **Case No. 1:21-cr-00015-APM** |
| **v.** | ) |
| | ) |
| **KELLY MEGGS,** | ) |
| | ) |
| **Defendant.** | ) |

## DEFENDANT KELLY MEGGS'S MOTION TO DISMISS COUNTS 1-3 AND 5

Defendant Kelly Meggs, by and through the undersigned counsel, files this Motion to Dismiss Counts 1-3 and 5 of the government's June 22, 2022, Superseding Indictment (ECF No. 167), pursuant to Rule 12 of the Criminal Rules of Procedure for the District of Columbia.

Defendant Kelly Meggs previously adopted the Motions to Dismiss filed by co-defendants Caldwell (ECF No. 240), and Harrelson (ECF No. 278). *See* Motion to Adopt (ECF No. 262). Defendant Kelly Meggs now also moves to adopt the Motions to Dismiss filed by co-defendant Hackett (ECF Nos. 89 and 90), and an earlier Motion to Dismiss filed by co-defendant Caldwell (ECF No. 84).

## I.      PROCEDURAL BACKGROUND

On January 12, 2022, a grand jury returned an Indictment ("the Indictment") which charged Kelly Meggs ("Mr. Meggs") and eleven other defendants ("the Rhodes defendants") with ten counts of violation of federal statute. Mr. Meggs was charged with seditious conspiracy in violation of 18 U.S.C. § 2384 (Count 1);  conspiracy to obstruct an official proceeding in violation of 18 U.S.C. § 1512(k) (Count 2); obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. § 1512(c)(2), 2 (Count 3); conspiracy to prevent an officer

from discharging any duties in violation of 18 U.S.C. § 372 (Count 4),  destruction of government property and aiding and abetting in violation of 18 U.S.C. § 1361, 2 (Count 5); and tampering with documents or proceedings and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(1), (2) (Count 10).

On or about June 22, 2022, the Government filed a Superseding Indictment against the Rhodes Defendants.  The Superseding Indictment changed the Charges against Kelly Meggs to Counts 1-5 and 8.  Count 8 is now what was Count 10 in the Indictment, (18 U.S.C. § 1512(c)(1)) and is specifically based on paragraphs 1 through 13, 18 through 134, and 146 of the Superseding Indictment as though set forth therein.  Count 5 remains (18 U.S.C. §§ 1361, 2), but is now specified as based on paragraphs 9, 95, 97, and 98 in addition to the facts as generally charged.  Count 4 remains, (18 U.S.C. § 372) based on the facts generally alleged in the Superseding Indictment.  Counts 2 and 3 similarly remain upon the facts generally alleged in the Indictment, (18 U.S.C. § 1512(k) and 18 U.S.C. §§ 1512(c)(2), 2 respectively).

Paragraphs 15 and 16 added '*to oppose by force the authority of the Government of the United States'* in support of the allegations and the Seditious Conspiracy Arguments:

Par. 15 of the Initial Indictment in relevant part:

…Did knowingly conspire, confederate, and agree with other persons known and unknown to the Grand Jury, by force to prevent, hinder, and delay the execution of any law of *the United States*.

Par. 15 in the Superseding Indictment in relevant part:

…Did knowingly conspire, confederate, and agree, with other persons known and unknown to the Grand Jury, *to oppose by force the authority of the Government of the United States, and* by force to prevent, hinder, and delay the execution of any law of the United States.

Par. 16 of the Original Indictment:

The purpose of the conspiracy was to oppose the lawful transfer of presidential power by force, by preventing, hindering, or delaying by force the execution of the laws governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code.

Par. 16 of the Superseding Indictment:

The purpose of the conspiracy was to oppose the lawful transfer of presidential power by force, *by opposing by force the authority of the Government of the United States and* by preventing, hindering, or delaying by force the execution of the laws governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code.

## II.        INTRODUCTION

As a highly relevant fact, Defendant Kelly Meggs is not actually charged with any violence such as assault, or weapons violations.  Mr. Meggs is alleged to have walked from the Rotunda, southbound towards the House of Representatives.  There is no specific evidence that Kelly Meggs used any force to enter the Capitol, much less that Mr. Meggs affirmatively sanctioned the use of force to enter the Capitol, nor are there any allegations that Mr. Meggs destroyed government property.

## III.       FACTUAL BACKGROUND

Specifically for the benefit of the court, the portions of the Superseding Indictment where Mr. Meggs or Stack One is referenced individually in the factual allegations are included below:

9.  Stack One joined *a mob* of people, *some of whom attacked officers* and tried to enter the Capitol while yelling, among other things, "Take their shields" and "Our house!"  *Attackers assaulted officers using pepper spray, flagpoles, and numerous improvised weapons and projectiles.*  They also disarmed the officers by stealing their shields and pushing them away from the Rotunda Doors.  At 2:38 p.m., the doors were breached, and *Stack One stormed* into the Capitol *alongside the mob. During the attack on the Capitol*, the Rotunda Doors and surrounding façade suffered damage worth thousands of dollars.

*See* Superseding Indictment, at 4, ¶ 9 (emphasis added).

Thereafter he is only named and identified as a member and head of the Florida chapter of the Oath Keepers in ¶ 13 of the Superseding Indictment.  And he is generally included with the defendants in the "purpose" of the Conspiracy at ¶¶ 15-16 as described earlier.  *Id.* at ¶¶ 15, 16.

Mr. Meggs is alleged to have attended a November 9th meeting, and sending a follow-up message:

> Immediately after that meeting, MEGGS sent a message to an invitation-only Signal group chat titled, "OKFL Hangout" ("OKFL Hangout Chat")—including HARRELSON, HACKETT, MOERSCHEL, and others—stating, "Anybody not on the call tonight. We have been issued a call to action for DC. This is the moment we signed up for…. ".

*Id.* at ¶¶ 19, 20.

> On November 22, 2020, the Florida chapter of the Oath Keepers, including Mr. Meggs, Mr. Harrelson, Mr. Hackett, and others – held a training on "unconventional warfare."'

*Id.* at ¶ 22.

After these allegations, a litany of statements allegedly made by various members of the different Oath Keepers groups follows, but these statements lack any specific response from Mr. Meggs.  However, Mr. Meggs is specifically quoted in the indictment as saying that, "we need to make *those senators* very uncomfortable *with all of us being a few hundred feet away.*"  *Id.* at ¶ 34 (*emphasis added*).

This statement demonstrates an intent to remain a few hundred feet away while letting Senators know they are there and why, actions of protest specifically protected by the First Amendment rights to assembly, freedom of association, and freedom of speech. The Superseding Indictment makes no allegation that Mr. Meggs joined any plan to use force on Senators or House Members or even to encounter them. The Superseding Indictment does not even allege

4

that Mr. Meggs was involved in any agreement about "preventing" a vote or a "conference" or a "meeting."

The Indictment alleges that, "[l]ater, Meggs, Harrelson, Watkins, Hackett, Moerschel, and others joined an invitation-only Signal group chat titled "OK FL DC OP Jan 6" ("Florida Signal Chat.")  Meggs was an Administrator of the Chat with Mr. Harrelson." *Id.* at ¶39. Mr. Meggs is then alleged to have sent a Facebook message to some unnamed person: "*You guys gonna carry?*" and "*Ok we aren't either*, we have a heavy QRF ten min out though." *Id.* at ¶ 42 (emphasis added). This demonstrates that again, the Superseding Indictment fails to allege that Mr. Meggs was involved in a plan to carry weapons in Washington D.C.

Mr. Meggs is further alleged to have paid to rent two rooms in Arlington, VA prior to January 6, 2021. *Id.* at ¶ 45.  Renting a room in Virginia is not in and of itself a violation of the law, even with the intent to keep weapons there.  Assuming arguendo such conduct was a violation of some law, Mr. Meggs has not been charged with a weapons crime.  The Superseding Indictment instead insists that the use of the term  "QRF" in and of itself means the place to is to store weapons for some future access.  Not only did that never  happen, but QRF is only a moniker used to describe the rooms Mr. Meggs rented rather than define how said rooms were used.

Mr. Meggs is alleged with specifics only as to communications about a "QRF location" and a posting of a DC Map regarding QRF and the closing of bridges and being a ground team lead. *Id.* at ¶¶ 49-50, 52, 54.  He is further alleged to have said regarding ammunition: "*I am checking on as far as what they will have for us <u>if SHTF</u>…just in case*" *Id. at* ¶56 (emphasis added) (the Superseding Indictment notes that SHTF means "If S--- Hit the Fan").  Again, '*If S--- Hit the Fan*" does not suggest a coordinated attempt to use force to "prevent a vote or the ECA"

much less the "lawful transfer of power."  There is no citation to any affirmation by Mr. Meggs

that weapons are to be used in Washington, DC much less at any specific time or place; the

Government's allegations make clear that Mr. Meggs viewed the need for weapons and use of

force as nothing more than a borderline impossible last resort, one that the Rhodes Defendants

did not resort to.  *See id.* generally.

> The allegations in the Superseding Indictment continue to be vague:

> 95. At the top of the steps, *Stack One pushed forward* as part of *the mob that*
> *aggressively advanced toward the Rotunda Doors, assaulted the law enforcement*
> *officers guarding the doors, threw objects and sprayed chemicals toward the*
> *officers and the doors, and pulled violently on the doors.*

*Id.* at ¶95 (*emphasis added*).

> The allegations of violence clearly pertain to <u>the mob</u>, rather than Stack One or Mr.

Meggs specifically.  This raises the obvious question, which the Superseding Indictment fails to

resolve: who specifically "*assaulted the law enforcement officers guarding the doors, threw*

*objects and sprayed chemicals toward the officers and the doors, and pulled violently on the*

*doors*"?

> Similarly:

> 97. At 2:39 P.M. *a member of Stack One* joined the crowd in forcibly pushing
> against one of the Rotunda Doors and the law enforcement officers guarding that
> door.  **<u>The mob then breached the doors</u>** and ***the Stack One member*** entered the
> building.

*Id.* at ¶97 (emphasis added).

> This idea of *the mob* breaching the doors gets repeated in the indictment in the next

paragraph:

> 98. *Shortly after the mob breached the Rotunda Doors*, Meggs, Harrelson,
> Watkins, Hackett, Moerschel, and others *forced* their way through the doors into
> the Capitol.

6

*Id.* at ¶98 (emphasis added).

Once again, the Superseding Indictment raises a question of "who forced and how?" but fails to answer the question.  Mr. Meggs is neither specifically alleged to have "*breached the Rotunda Doors*" nor is Mr. Meggs alleged to have made contact physically with the doors or law enforcement officers.

> 99.  As they entered the Capitol, Meggs, Harrelson, Watkins Hackett, Moerschel, and others *joined the larger mob in pushing past at least one law enforcement officer* who was trying to stop the attack on the Capitol.

*Id.* at ¶99 (emphasis added).[1]

Now the allegation is that "*the larger mob pushed* past *one* law enforcement officer[.]" Once again, the Superseding Indictment raises a question of "who pushed against which officer?" while failing to answer it.

> 106.  At 2:45 p.m., Meggs, Harrelson, Hackett, Moerschel, and other Stack One Members walked southbound out of the Rotunda and *toward the House* of Representatives in search of Speaker Pelosi.  They did not find Speaker Pelosi.

*Id.* at ¶106 (*emphasis added*).

---

[1]  In the Rhodes Detention Hearing, at p. 67, the FBI Agent, Special Agent Palian testifying also states:

> 10 Q. Have you watched some public source video about
> 11 what happened outside those doors around 2:38 p.m.?
> 12 A. Yes.
> 13 Q. Did the mob, with some help of rioters inside the
> 14 building, force the doors open?
> 15 A. They did at about 90 seconds before Stack 1
> 16 entered, yes.
> 17 Q. Was Stack 1 present in that mob a few rows back
> 18 from the door around that time?
> 19 A. Yeah, they were 10 to 20 feet back.

(Tr. for the Detention Hrg of 01/24/202 in *U.S. v. ELMER STEWART RHODES, III*, in the U.S. District Court for the E.D. of Texas, 4:22-MJ-0011-KPJ, at p. 67 L. 10- L. 19).

The Superseding Indictment alleges that Mr. Meggs "*walked toward* the House of Representatives" but did not reach it. Further, the Superseding Indictment fails to allege that Mr. Meggs reached  Speaker Pelosi's Office. Finally, the Superseding Indictment fails to allege that Mr. Meggs or any of the Rhodes Defendants attempted to or actually did contact her staffers, her office, or Speaker Pelosi.

The amount of time that Mr. Meggs was present inside the Capitol, is noticeably absent from the Indictment.  However, prior indictments, including the Sixth Indictment, included as alleged facts:

> "*at 2:39 P.M. Isaacs to have joined the crowd to forcibly to have pushed* at the East Side Rotunda Doors and the law enforcement officers.  Shortly thereafter the Capitol Doors *were breached by the Mob and Isaacs entered* the building."

6th Superseding Indictment, *U.S. v. Caldwell,* ECF 513, ¶ 144 (*emphasis added*).

> "About a minute later, Kelly Meggs, [and others] forcibly entered…"

*Id.* at ¶ 145 (emphasis added).

> "*at 2:45 PM* Kelly Meggs … walked southbound of out of the Rotunda toward the House of Representatives."

*Id.* at ¶ 156 (emphasis added).

Mr. Meggs is alleged to have exited the Capitol at 2:59 P.M.

*Id.* at ¶ 161.

The current indictment does not specify the times for Mr. Meggs entry and exit of the Capitol, it appears, so that these facts may be conflated alleging that Mr. Meggs entered the Capitol, joined a large mob, moved past said mob and posted Captiol security, spent time "in search of Pelosi," and then exited the Capitol, once again past the same mob, in a total of *fourteen (14) minutes of leaving the Rotunda. See Id.* at ¶¶ 144, 156, 161.

These facts at their most damning only allege "trespass," and the general allegations are that he was physically in the Rotunda, and "in the direction of the House," but is not alleged to have gone to the Galleries, the Senate or House floors or any office.  *See* Superseding Indictment. In other words, the facts in the Superseding Indictment fail to allege a violation of any of the statutes on which the Government bases their counts against the Rhodes Defendants.

The allegations in the Superseding Indictment that appear to relate to at best, to a back-up plan, ""*if SHTF"* ('*if 's--- hits the fan)* and *"just in case"* – or as Defendant Rhodes is charged to have said "*in case of worst case* [sic] *scenarios."*  Superseding Indictment at ¶ 70.  The Superseding Indictment fails to allege that Mr. Meggs or any of the Rhodes Defendants brought weapons from the alleged "QRF" to the District of Columbia, or that there was ever a specific plan to do so.

The Superseding Indictment alleges that after January 6, Mr. Meggs wrote a message stating: "We aren't quitting!! We are reloading!!" If true, this merely alleges  rhetoric, because again the government failed to allege the use of any guns, meaning any allegation that this message meant that firearms were being reloaded falls flat.  As such, the message stands alone without conduct to corroborate it.  *Id.* at ¶126 c.  Furthermore, "[o]n January 10, 2021 JAMES sent MEGGS a message asking if MEGGS and other Florida Oath Keepers were coming to Texas, and MEGGS responded, "Fl stays home until shots fired!"  *Id.* at ¶131.  Again, not supporting any intent by Meggs as having any plan to initiate any use of weapons.

Undisputedly *there are no allegations* regarding Mr. Meggs having a *specific plan or affirmatively joining such a plan,* on "*continuing to plot, after January 6, 2021, to oppose by force the lawful transfer of presidential power."  Id.* p. 9, at ¶¶¶ g, h, i.  Lacking further are any

allegations regarding a specific plan "to prevent, hinder, and delay the *Certification of the*
*Electoral College Vote*." *Id.*

By seeking the dismissal of Counts 1 through 3, and 5 of the Government's Superseding
Indictment, Mr. Meggs does not intend to diminish the significance of the events of January 6.
However, the Government intends to convict Mr. Meggs, a grandfather without any prior
criminal convictions or even allegations of any criminal misconduct made against him, of
significant federal felonies, including Obstruction of Justice and the violation of a Civil War Era
Sedition Statute The Government intends to convict Mr. Meggs without alleging any significant
wrongdoing beyond allegations that he walked around in a coordinated formation and made
communications regarding a "QRF" only in the event of a "*worst case scenario*."  These
communications were undisputedly not specific and referred to actions that never took place.
The Government attributes to Mr. Meggs an overwhelming amount of responsibility for the
events of the day despite alleging any reason for placing such significant focus on him.  The
Superseding Indictment does so through a bare recitation of statutory elements unsupported by
specific facts -- despite having had more than a year and half to investigate.

## IV.        LEGAL ARGUMENT

### A.  Legal Standard

Rule 7 of the Federal Rules of Criminal Procedures provides that "the indictment or
information must be a plain, concise, and definite written statement of the essential facts
constituting the offense charged . . ."  Fed. R. Crim. P. 7(c)(1). A defendant may move to dismiss
an indictment on the grounds that, *inter alia*, it fails to state an offense or contains multiplicitous
counts.  Fed. R. Crim. P. 12(b)(3)(B).

In considering a Rule 12 motion to dismiss, "the Court is bound to accept the facts stated in the indictment as true." *United States v. Syring*, 522 F. Supp. 2d 125, 128 (D.D.C. 2007). An "indictment must be viewed as a whole" and the "allegations must be accepted as true" in determining if an offense has been properly alleged. *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011). The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id.* In addition, to be sufficient, an indictment must "fairly inform[] [the] defendant of the charge against which [s]he must defend, and [] enable[] [her] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S. Ct. 2887, 2907 (1974).

### i.   The Conspiracy Fails As A Matter Of Law

The Superseding Indictment makes clear that Count 1, 18 U.S.C. § 2384, charges in relevant part,

**The Conspiracy**

15.    From in and around November 2020, through in and around January 2021, in the District of Columbia and elsewhere, the defendants, …did knowingly conspire, confederate, and agree, with other persons known and unknown to the Grand Jury, to oppose by force the authority of the Government of the United States, and by force to prevent, hinder, and delay the execution of any law of the United States.

**Purpose of the Conspiracy**

16.    The purpose of the conspiracy was to oppose the lawful transfer of presidential power by force, by preventing, hindering, or delaying by force the execution of the laws governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code. The purpose of the conspiracy was to oppose the lawful transfer of presidential power by force, *by opposing by force the authority of the Government of the United States and* by preventing, hindering, or delaying by force the execution of the laws governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code."

11

Superseding Indictment at ¶¶ 15, 16.

While other protestors ("*the Mob*") are alleged to have engaged in violent conduct, Mr. Meggs' mere alleged presence as part of Stack One does not plead adequately to establish a claim for the use of force to oppose the authority of the government: "[M]ere association, standing alone, is inadequate; an individual does not become a member of a conspiracy merely associating with conspirators known to be involved in crime." *United States v. Gaskins*, 402 U.S. App. D.C. 262, 273 (D.C. Cir., 2012) (*quoting United States v. Wardell*, 591 F.3d 1279, 1288 (2009)). *See also United States v. Dellosantos*, 649 F.3d 109, 115 (1st Cir. 2011) ("The agreement is the *sine qua non* of a conspiracy, and this element is not supplied by mere knowledge of an illegal activity . . . , let alone by mere association with other conspirators." (internal quotation marks omitted)); *United States v. Diaz*, 637 F.3d 592, 602 (5th Cir. 2011) ("If all that was shown was a defendant's . . . 'close association with conspirators,' jurors would not be entitled to infer participation in the conspiracy." (internal quotation marks omitted)); U.S. v. *Nusraty*, 867 F.2d 759, 764 (2d Cir 1989) ("[M]ere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement.")

Further, the Supreme Court has held that, '[t]he same conclusion follows for acts of concealment that postdate the conclusion of the conspiracies. Even in the context of criminal conspiracies, acts of concealment that follow completion of the conspiracies' main objective are generally not considered to be part of the conspiracy. *See Grunewald v. United States*, 353 U.S. 391, 402 (1957).

Nowhere in the operative Indictment does the Government allege any specific facts to show that Mr. Meggs entered into a *criminal agreement* to commit any offense *against the United States*. Nowhere in the Indictment does the Government allege facts supporting its presumption that the

intent of the alleged conspiracy was to interfere through use of force with the "certification of the electoral college vote." Rather, as the Indictment acknowledges Mr. Meggs's alleged co-conspirators alleged to have agreed *not* to bring firearms or other dangerous weapons to the Capitol Building and, in fact, *none* are alleged to have done so.

### B. *The Statutes in Counts 1-3 Are Constitutionally Vague as Applied*

#### i. Count 1 (18 U.S.C. § 2384)

Thomas Caldwell's Motion to Dismiss at ECF 84, incorporated herein, ('As used in § 2384, the phrase "execution of any law of the United States" was obviously intended to apply to actions by the President and those acting under his authority.' (ECF 84 at p. 16): "Second, assuming that Members of Congress can be divined from the Indictment's language as the human targets of the seditious conspiracy, Count 1 still must be dismissed because the Supreme Court has made clear that Members of Congress are constitutionally prohibited from executing the law. *Bowsher v. Synar*, 478 U.S. 714, 726-27 (1986)." The addition of "*by opposing by force the authority of the Government of the United States*" does not change the argument. The government of the United States again refers to the government under the Executive Branch. The Judiciary is not generally referred to as the "government" of the United States, nor is Congress.

For example, it was recently held that, 'Instead, an implied executive privilege "derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities," *Nixon v. GSA*, 433 U.S. at 447, is "fundamental to the operation of Government[,] and [is] inextricably rooted in the separation of powers under the Constitution[.]"' *Trump v. Thompson*, 20 F.4th 10, 26, (D.C. Cir. 2021) (*citing United States v. Nixon*, 418 U.S. 683, 708 (1974) (holding that "the [executive] privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.") Another well-known

example is how the FOIA Act defined agency: "As amended in 1974, the Act defines "agency" as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 5 U.S.C. § 552(e) (*emphasis added*)." *Meyer v. Bush*, 981 F.2d 1288, 1291, (D.C. Cir. 1993). Congress, of course, is not subject to FOIA. *See generally* 5 U.S.C. § 551(1)(A) ("For the purpose of this subchapter . . . "agency". . . does not include . . . the Congress[.]"

The Supreme Court addressed the first clause of what is now 18 U.S.C. §2384,

It remains only to consider that part of the questions certified which relates to § 5336. That section provides for the punishment of those who conspire, 1, "to overthrow, put down, or destroy by force the government of the United States, or to levy war against them, or to oppose by force the authority thereof;" or, 2, "by force to prevent, hinder, or delay the execution of any law of the United States." or, 3, "by force to seize, take, or possess any property of the United States contrary to the authority thereof." This is a re-enactment of similar provisions in the act of July 31, 1861, c. 33, 12 Stat. 284, "to define and punish certain Conspiracies," and in that of April 20, 1871, c. 22, § 2, 17 Stat. 13, "to enforce to Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes.

It cannot be claimed that Baldwin has been charged with a conspiracy to overthrow the government or to levy war within the meaning of this section. Nor is he charged with any attempt to seize the property of the United States. All, therefore, depends on that part of the section which provides a punishment for "opposing" by force the authority of the United States, or for preventing, hindering, or delaying the "execution" of any law of the United States.

…This evidently implies force against the government as a government. To constitute an offence under the first clause, the authority of the government must be opposed; that is to say, force must be brought to resist some positive assertion of authority by the government. A mere violation of law is not enough; there must be an attempt to prevent the actual exercise of authority. That is not pretended in this case. The force was exerted in opposition to a class of persons who had the right to look to the government for protection against such wrongs, not in opposition to the government while actually engaged in an attempt to afford that protection."

*Baldwin v. Franks*, 120 U.S. 678, 693  (1887).   The Court explained further, that "[s]o, too, as to the second clause, the offence consists in preventing, hindering, or delaying the government of the United States in the execution of its laws.  This, as well as the other, means something more than setting the laws themselves at defiance. There must be a forcible resistance of the authority of the United States while endeavoring to carry the laws into execution."  *Id*. at 693.

This court previously found that:  "Congress passed the Enforcement Act of 1871, also known as the Ku Klux Klan Act, to enforce the Provisions of the Fourteenth Amendment of the Constitution of the United States [which] eventually would become the seditious conspiracy statute under the modern federal criminal code."

But as the Supreme Court held, "Section 2 of the Ku Klux Act attached civil and criminal liability to conspiracy "for the purpose, either directly or indirectly, of depriving any person or any class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws . . . ." 17 Stat. 13. The civil provisions of this section were carried forward, as amended, in R. S. § 1980, and are now found in 42 U. S. C. § 1985. The criminal provisions, carried forward in R. S. § 5519, were declared unconstitutional in *United States v. Harris*, 106 U.S. 629, and *Baldwin v. Franks*, 120 U.S. 678.  *Monroe v. Pape*, 365 U.S. 167, 256 n. 85 (1961) (*emphasis added*).

Historically since those cases, 18 U.S.C. §2384, has been consistently applied very specifically with the Constitution. *United States v. Rodriguez*, 803 F.2d 318, 319 (7th Cir. 1986) *cert. denied*, 480 U.S. 908  (1987). (finding a Defendant guilty of seditious conspiracy "after trial, in which the evidence showed that Jose Rodriguez was driver to the bombing cites of for the FALN, which had claimed responsibility for the use of force, terror and violence, including the

construction and planting of explosive devices at banks, stores, office buildings and *government* buildings in the Chicago area.") (emphasis added).

> In a state based criminal case, the Court of Appeals of New York held that, Under the State statute, to charge the members of either the Committee of 48 or the American Civil Liberties Union with the commission of a crime, it would be necessary to charge that such members either organized or helped to organize, became members of or voluntarily assembled with associations formed to teach or advocate *criminal anarchy*, the doctrine *that organized government should be overthrown by violence, by assassination of the executive head or any of the executive officials or by any unlawful means.* (Penal Law, §§ 160, 161.) No such purpose is attributed to either of said organizations in the portions of the pamphlet devoted to an exposition of their purposes.

*Hays v. American Defense Soc.,* 252 N.Y. 266, 275, 169 N.E. 380, 383, (N.Y. Court of Appeals 1929) ("The Federal statute limits the offense [seditious conspiracy] to an attempt by force to overthrow the government. (Mason's U. S. Code, Annotated, title 18, ch. 1, § 6; Criminal Code, § 6; R. S. § 5336; Mar. 4, 1909, ch. 321, § 6; 35 Stat. 1089.) There is no charge of such an act on the part of the plaintiff or the organizations to which he belongs.").

The Ninth Circuit made clear in holding that being a Member of a Communist Party violated the First or Fifth Amendments made § 504 of the Labor-Management and Reporting Act unconstitutional.[2]

> We conclude that the relationship between the conduct or status punished and the evil intended here to be prevented is not sufficiently close or substantial to meet the requirements of either the First or Fifth Amendments unless § 504 can be construed as requiring proof either that the defendant has specific intent to use his union office to attempt to disrupt interstate commerce or that he is an active member of the Communist Party with specific intent to promote unlawful party advocacy and action directed toward overthrow of the Government. …But in each case ambiguous statutory language made such construction available. 6. …Not only then, is the statute over-broad. It is so wholly lacking in notice of the

---

[2] The Court of Appeals for the Ninth Circuit stated '[i]t is true that in *Dennis v. United States* (1951) 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, *Yates v. United States* (1957) 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 and *Scales v. United States, supra*, criminal statutes, as applied to Communist activity or membership, were construed narrowly to include requirements of intent and unlawfulness of advocacy that were sufficient to remove doubts as to the constitutionality".

constitutionally essential components of the crime that it cannot be judicially narrowed….

*Brown v. United States*, 334 F.2d 488, 496-497, (9th Cir. 1964)

As the facts allege, there is no supporting contention in the entire Superseding Indictment that Mr. Meggs sought to overthrow the Congress with such unlawful violence. As stated previously, Mr. Meggs was not even charged with assault or with any weapons violations, and there is no communication by Mr. Meggs supporting the overthrow of the government by violence, by assassination of the executive head of or any of the executive officials or by any unlawful means, on January 6 or thereafter.

> ii.  <u>Counts 2 and 3 (18 U.S.C. § 1512(k) and 18 U.S.C. § 1512(c)(2), 2 respectively)</u>

Count 2 and 3 are similarly unsupported by the facts alleged, and again incorporating Mr. Caldwell's Motion to Dismiss at ECF 84:  To accurately read the statute, the Court should consider the language of § 1512(c) sans "otherwise":

(1) [Whoever corruptly] alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) [Whoever corruptly] obstructs, influences, or impedes any official proceeding, or attempts to do so[.]

> Without "otherwise," (c)(1) and (c)(2) are disjunctive, independent clauses, clearly delineate separate conduct, and make perfect sense on their own. In other words, without using the word "otherwise," (c)(1) and (c)(2) describe plainly separate and independent conduct consistent with the Court's interpretation of the statute. Stated another way, as "or" (without "otherwise") 100% effectively disjoins the clauses, "otherwise" could not have been included in the statute for the purpose of underscoring disjunction… Contrary to the Court's holding, respectfully, "otherwise" in § 1512(c)(2) must have been inserted for a reason other than disjunction.

ECF 84 at p.23

        C.  *The First Amendment Applies to the Charges of Sedition and Obstruction of Justice.*

    In conspiracy crimes the Supreme Court has explained that "The rule we deduce from these cases is that where an offense is specified by a statute in nonspeech or nonpress terms, a conviction relying upon speech or press as evidence of violation may be sustained only when the speech or publication created a "clear and present danger" of attempting or accomplishing the prohibited crime, e. g., interference with enlistment." *Dennis v. United States*, 341 U.S. 494, 505 (1951).

    The Superseding Indictment alleges that Mr. Meggs agreed to meet after a rally in support of President Trump with others, and of that meeting the Superseding Indictment alleges Mr. Meggs to have said, "we need to make those senators very uncomfortable with all of us being a few hundred feet away." Superseding Indictment at ¶ 34 (emphasis added). This demonstrates the efforts and intent of the Oath Keepers Rhodes Defendants to engage inactivity protected under the First Amendment to the U.S. Constitution. The allegations in the Superseding Indictment lack the fundamental premise set forth by Edwards, *supra*, as required. Superseding Indictment ¶ ¶ 15, 16. *See Edwards v. S. Carolina*, 372 U.S. 229, 238, (1963) ("A three step analysis is required for resolving free speech claims on public property."). This Court, therefore, must undertake that analysis. *See Texas v. Johnson*, 491 U.S. 397, 406-07 (1989) ("'A law directed at the communicative nature of conduct must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires.' It is, in short, not simply the verbal or nonverbal nature of the expression, but the governmental interest at stake, that helps to determine whether a restriction on that expression is valid.") (*quoting Community for Creative Non-Violence v. Watt*, 703 F.2d 586, 622-23 (Scalia, J., dissenting) (emphasis original), *rev'd sub nom. Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984)). *See also Reno v.*

*ACLU*, 521 U.S. 844, 870-71 (1997) ("In addition to the opprobrium and stigma of a criminal conviction, [a criminal statute regulating speech] may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images.  As a practical matter, this increased deterrent effect, coupled with the 'risk of discriminatory enforcement' of vague regulations, poses greater First Amendment concerns than those implicated by . . . civil regulation . . .").

In *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C.), aff'd, 409 U.S. 972, 34 L. Ed. 2d 236, 93 S. Ct. 311 (1972), Judge McGowan, Circuit Judge, issued the opinion that struck former 40 USCS § 193g on constitutional grounds:

> Vagueness and overbreadth, although related are separate concepts having their immediate foundations in the Fifth Amendment due process clause. The First Amendment has its own force, however, independently of due process concepts such as vagueness and overbreadth. A statute which directly impinges upon rights granted in that Amendment may be found constitutionally defective without resort to due process formulations. We think that is the case here, although the result we reach would also be compelled by due process considerations of overbreadth.

*Id*. at 582.

The opinion further highlights the constitutional vagueness of the application of 18 U.S.C. § 2384, and even that of 18 U.S.C. §1512, because neither Mr. Meggs, nor his co-defendants, have been alleged to have entered the Senate and House floors.   In applying the First Amendment, the Court noted that "[t]he Capitol Grounds (excluding such places as the Senate and House floors, committee rooms, or the galleries,) have traditionally been open to the public; indeed, thousands of people visit them each year.  Thus we cannot agree with the defendants that the Capitol Grounds have ever been characterized by the serenity and quiet of a hospital or library."  *Id.* at 584 (emphasis added).  The government did not charge Mr. Meggs with a violation of 40 U.S.C § 5104, specific to misconduct at the Capitol.  Nevertheless Mr. Meggs, along with co-defendants, face

19

two federal felony statutes, 18 U.S.C. § 2384 and 18 U.S.C. § 1512 in counts 2 and 3, that have never been previously applied to protestors inside or outside at the Capitol.

This is relevant because the First Amendment applies to any statute applied to protestors at the Capitol, and even inside the Capitol. *See Jeannette Rankin Brigade,* 342 F. Supp. 575. The court differentiated the right of protestors at Courthouses, versus those at the Capitol:

> Nor is the primary purpose for which the Capitol was designed – legislating – incompatible with the existence of all parades, assemblages, or processions which may take place on the grounds. In *Cox II, supra*, the Supreme Court upheld a state statute which banned parades and picketing " in or near courthouses" which have the "intent of interfering with, obstructing, or impeding the administration of justice, or . . . the intent of influencing any judge [or] juror. . . ." The Court felt that the integrity of the judicial process could not survive in an atmosphere of mob excitement. But while, as Judge Bazelon said (dissenting in *Jeannette Rankin, supra*), "traditionally, the judiciary does not decide cases by reference to popular opinion," the fundamental function of a legislature in a democratic society assumes accessibility to such opinion. Moreover, the Capitol Grounds defined in this statute are so e"tensive that demonstrations which may take place upon them might not be "near" or "in the immediate vicinity of" the Capitol itself. More to the point here, therefore, than *Cox II* is *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S. Ct. 680, 683, 9 L. Ed. 2d 697 (1963) where the Court held unconstitutional a breach of the peace conviction of civil rights demonstrators who were demonstrating on the grounds of the state legislature – an activity which the Court viewed as "an exercise . . . of these basic constitutional rights in their most pristine and classic form."

*Id*. at 584 (*citing Cox II, Edwards v. South Carolina*, 372 U.S. 229, 235 (1963)).

The Court in *Edwards v. South Carolina*, found that it was inappropriate for South Carolina to criminalize speech that 'stirred people to anger…': As in the *Terminiello* case, the courts of South Carolina have defined a criminal offense so as to permit conviction of the petitioners if their speech "stirred people to anger, invited public dispute, or brought about a condition of unrest. A conviction resting on any of those grounds may not stand." *Id.*, at 5.

As Chief Justice Hughes wrote in *Stromberg v. California*, 283 U.S. 359, 369, "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an

opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system. A statute which upon its face, and as authoritatively construed, is so vague and indefinite as to permit the punishment of the fair use of this opportunity is repugnant to the guaranty of liberty contained in the Fourteenth Amendment. . .”

In *Edwards*, the Court further held that,

‘Under Cornelius v. NAACP Legal Defense and Education Fund, Inc., 473 U.S. 788, 797, 87 L. Ed. 2d 567, 105 S. Ct. 3439 (1985), there is a three-step analysis required for resolving free speech claims on public property. First, the activity threatened or affected by governmental action must be identified, and it must be determined whether it is speech protected under the First Amendment.  Bynum v. United States Capitol Police Bd., 93 F. Supp. 2d 50, 54, (D.D.C. 2000), vacated in part (on o’ grounds), 96 F. Supp. 2d 4, 2000 U.S. Dist. LEXIS 7247 (D.D.C. 2000), Bynum v. United States Capitol Police Bd., 2000 U.S. Dist. LEXIS 7248 (FURTHER ORDERED that defendants, their agents and employees are ENJOINED AND RESTRAINED from enforcing any restrictions on First Amendment conduct within the United States Capitol on the basis that such conduct is "expressive conduct that convey[s] a message supporting or opposing a point of view or has the . . . propensity to attract a crowd of onlookers;”).

*Edwards v. South Carolina*, 372 U.S. 229, 238 (1963)

In *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870-87 (1997), the Supreme Court made clear that when action under the First Amendment is restricted, the Statute has to be analyzed accordingly. *Reno v. ACLU*, 521 U.S. 844, 870-871. (“[r]egardless of whether the CDA is so vague that it violates the Fifth Amendment, the many ambiguities concerning the scope of its coverage render it problematic for purposes of the First Amendment.”)

### D.  The Rule of Lenity and Ambiguities in the Statute

Thomas Caldwell’s argument showed true ambiguity of the text at a minimum, which the court implicitly recognized when the court ‘wished’ for the original drafters.[3]  That is the point,

---

[3] Transcript Of Motion Hearing Proceedings Before The Honorable Amit P. United States District Judge, TR. 63: L.1-5: “So what did Congress intend in 1861? We don't have the members of Congress here to testify.  And so what I'm saying, Your Honor, is -- THE COURT: I wish we did.”

that the statute at a minimum is unclear in its application to congress, because it is not at all express that the Sedition statute intends to include congressional members, who do not execute the law. That ambiguity becomes the relevant point because it should be resolved in the Defendant's favor.

The government's sedition charge alleges that Defendants "[conspired to] by force to *prevent, hinder, or delay the execution of any law of the United States*," but neither Mr. Meggs nor any other defendant, were on notice that the conduct with which they are alleged to have engaged would violate the sedition statute, as applied; it is, therefore, void for vagueness.

"[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Construction Company*, 269 U.S. 385, 391 (1926). "[A] penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct it prohibits, and do so in a manner that does not invite arbitrary and discriminatory enforcement by which 'policemen, prosecutors, and juries…pursue their personal predilections.'" *U.S. v. Poindexter*, 951 F.2d 369, 378 (D.C. Cir. 1991) (*citing Kolender v. Lawson*, 461 U.S. 352, 357-58, 103 S. Ct. 1855, 1858  (1983).  Any "ambiguity" as to the meaning of terms in a statute must be construed against the Government and in favor of a defendant under the rule of lenity. *See*, e.g., *United States v. Cook*, 594 F.3d 883, 890 (D.C. Cir.), *cert. denied*, 560 U.S. 947 (2010).[4] *United States v. Granderson*, 511 U.S. 39, 54 (1994), (Under the Rule of Lenity, "where text, structure, and history fail to establish that the

---

[4] Even if the Court "harbored any doubt about this — that is, [it] were [] unable to find 'an unambiguous intent on the part of Congress'" from all these authorities, the Court should "turn to the rule of lenity to resolve the dispute." *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1246 (D.C. Cir. 2008) *(quoting United States v. West,* 393 F.3d 1302, 1311 (D.C. Cir. 2005)); *see also Moskal v. United States*, 498 U.S. 103, 108 (1990) ("[W]e have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute."). The rule is "rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited." *Dunn v. United States*, 442 U.S. 100, 112 (1979) (citations omitted).

government's position is unambiguously correct," courts must "apply the rule of lenity and resolve the ambiguity in [the defendant's] favor."), *see also Liparota v. United States*, 471 U.S. 419, 425 (1985)(" Absent indication of contrary purpose in the language or legislative history of the statute, we believe that § 2024(b)(1) requires a showing that the defendant knew his conduct to be unauthorized by statute or regulations.)  In *Liparota*, the Court explained that applied the Rule of Lenity[5] to the statute at issue there because "[t]his construction is particularly appropriate where, as here, to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct*." Id*. at 426.

> Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability. *See United States v. Bass, supra*, at 348 ("[Because] of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity"). Although the rule of lenity is not to be applied where to do so would conflict with the implied or expressed intent of Congress, it provides a time-honored interpretive guideline when the congressional purpose is unclear. In the instant case, the rule directly supports petitioner's contention that the Government must prove knowledge of illegality to convict him under § 2024(b)(1).'

*Id.* at 427-428.

> Also Judge Nichols recently found due process lacking regarding 18 U.S.C §1512:

> First, federal courts have "traditionally exercised restraint in assessing the reach of a federal criminal statute." *United States v. Aguilar*, 515 U.S. 593, 600 (1995). The Supreme Court has urged this restraint "both out of deference to the prerogatives of Congress and out of concern that 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.'" *Id.* At 600 (citations omitted); *cf. Sessions v. Dimaya*, 138

---

[5] 'In addition, requiring *mens rea* is in keeping with our longstanding recognition of the principle that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971). *See also United States v. United States Gypsum Co.*, supra, at 437; *United States v. Bass*, 404 U.S. 336, 347-348 (1971); *Bell v. United States*, 349 U.S. 81, 83 (1955); *United States v. Universal C. I. T. Credit Corp.*, 344 U.S. 218, 221-222 (1952).

S. Ct. 1204, 1223–28 (2018) (Gorsuch, J., concurring in part and concurring in judgment). This "prudent rule of construction" continues with force today.

*Dowling v. United States*, 473 U.S. 207, 214 (1985); *see Marinello v. United States*, 138 S. Ct. 1101, 1108 (2018) (endorsing the rule).

> Running parallel to this principle is the rule of lenity. "[T]he rule of lenity is venerable," *United States v. Nasir*, 17 F.4th 459, 472 (3d Cir. 2021) (*en banc*) (Bibas, J., concurring), having arisen to mitigate draconian sentences in England and having been firmly established in English law by the time of Blackstone, *id.* at 473. "[I]t took root in our law soon thereafter."

*Id.*[6]

### E.  Double Jeopardy

Counts 1-3 must be dismissed because they violate the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution, as each count against Mr. Meggs criminalizes the same conduct.  Where one act or transaction violates multiple statutory provisions, the applicable test to determine whether the Double Jeopardy clause has been violated is whether each provision requires proof of a fact which the other does not."

*Blockburger v. United States*, 284 U.S. 299, 304 (1932).  Under this test, "unless each statute requires *proof of an additional fact* which the other does not, the Double Jeopardy clause prohibits successive prosecutions."  *Brown v. Ohio*, 432 U.S. 161, 166 (1977) (emphasis added).  Furthermore, while on the face of an indictment the same statutory violation may not be alleged twice, "[i]t has been long understood that separate statutory crimes need not be identical – either

---

[6] Judge Nichols continued, "Under the rule of lenity, courts construe penal laws strictly and resolve ambiguities in favor of the defendant," id., so long as doing so would not "conflict with the implied or expressed intent of Congress," *Liparota v. United States*, 471 U.S. 419, 427 (1985). Under current doctrine, the rule of lenity applies to instances of "grievous" ambiguity, *see Shular v. United States*, 140 S. Ct. 779, 788 (2020) (Kavanaugh, J., concurring) (collecting citations), a construction that is arguably in tension with the rule's historical origins, see 1 William Blackstone, Commentaries *88 ("Penal statutes must be construed strictly."). *See also Wooden v. United States*, ___ U.S. ___, ___ (2022) (Gorsuch, J., concurring in judgment) (slip op. at 9–12); *but see id.* (Kavanaugh, J., concurring) (slip op. at 1–4).

in constituent elements or in actual proof – in order to be the same within the meaning of the constitutional prohibition." *Brown*, 432 U.S. at 164. Here, in violation of the Double Jeopardy Clause, the government charges Mr. Meggs with violations of two statutes requiring proof of facts that are not unique as to each other.

In *Albernaz v. United States*, 450 U.S. 333 (1981), the Supreme Court held that, "[i]t is well settled that a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy clause." *Id.* at 345 n. 3. In *Albernaz*, however, the defendants were charged with conspiracy to import marijuana and conspiracy to distribute marijuana, which required proof of two different ends of the proscribed object of the conspiracy.

18 U.S.C. § 2384 and §1512(c)(2),(k) do not require proof of a unique fact as to each other. A valid indictment fulfills the Fifth Amendment's edicts that citizens are not placed in jeopardy twice for the same offense. *Stirone v. United States*, 361 U.S. 212, 218 (1960); *United States v. Martinez*, 764 F.Supp.2d 166, 170 (D.D.C.2011) (quotations and citations omitted). *Ianelli v. United States*, 420 U.S. 770 (1975), is distinguishable in that there, the Supreme Court held that charging one with a conspiracy to commit an offense as well as the underlying offense does not violate the Double Jeopardy clause. *Id.* at 785 ('The test articulated in *Blockburger v. United States*, 284 U.S. 299 (1932), serves a similar function of identifying congressional intent to impose separate sanctions for multiple offenses arising in the course of a single act or transaction. In determining whether separate punishment might be imposed, *Blockburger* requires that courts examine the offenses to asce"tain "whether each provision requires proof of a fact which the other doe" not."')

18 U.S.C. § 2384 requires that a defendant, "conspire to … or by force to prevent, hinder, or delay the execution of any law of the United States." Obstruction of an official proceeding

25

under 18 U.S.C. § 1512, requires that a defendant "corruptly . . . obstruct[], influence[], or impede[] any official proceeding." Here, the government has alleged that by entering the Capitol grounds as well as the Capitol, Mr. Meggs conspired to obstruct an official proceeding.

With regards to "the lawful transfer of power," the Indictment charges:

4.      RHODES and certain co-conspirators, to include selected regional leaders, planned to stop the lawful transfer of presidential power by January 20, 2021, which included multiple ways to deploy force. They coordinated travel across the country to enter Washington, D.C., equipped themselves with a variety of weapons, donned combat and tactical gear, and were prepared to answer 'HODES'S call to take up arms at 'HODES'S direction. Some co- conspirators also amassed firearms on the outskirts of Washington, D.C., distributed them "mong "quick reaction"fo"ce""("QRF") teams, and planned to use the firearms in support of their plot to stop the lawful transfer of presidential power.

*See* Superseding Indictment at ¶4.

As for the charge on 18 U.S.C. § 1512, the Indictment alleges in relevant part:

**"Oath Keepers Attack the United States Capitol on January 6, 2021"**

5.      Beginning in late December 2020, via encrypted and private communications applications, RHODES and various co-conspirators coordinated and planned to travel to Washington, D.C., on or around January 6, 2021, the date of the Certification of the Electoral College vote. RHODES and several co-conspirators made plans to bring weapons to the area to support the operation. The co-conspirators then traveled across the country to the Washington, D.C., metropolitan area in early January 2021.

6.      On January 6, 2021, the Joint Session convened at the Capitol building for the Certification of the Electoral College vote…

12.      While certain Oath Keepers members and affiliates inside of Washington, D.C., breached the Capitol grounds and building, others remained stationed just outside of the city in QRF teams. The QRF teams were prepared to rapidly transport firearms and other weapons into Washington, D.C., in support of operations aimed at using force to stop the lawful transfer of presidential power. The QRF teams were coordinated, in part, by THOMAS CALDWELL and EDWARD VALLEJO.

*Id.* at ¶¶ 5, 6, 12.

Evidence of this duplication of facts and elements of the charges, are evidenced by the

Purpose of the Conspiracy set forth in the Indictment:

> The purpose of the conspiracy was to oppose the lawful transfer of presidential power by force, by preventing, hindering, or delaying by force the execution of the laws governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code.

*Id.* at ¶ 16.

The Indictment makes clear in citing the application of the Twelfth Amendment, which

addresses (i) that Vice-President Pence determines which slate of electors' votes count; (ii) how

objections from members of Congress to any proffered slate of electors is adjudicated in that (iii)

if no candidate has a majority of 270 electoral votes, then the House of Representatives shall

choose the President where "the votes shall be taken by states, the representation from each state

having one vote," U.S. CONST. amend. XII.  Further the government cites Title 3, Section 15 of

the U.S. Code, et seq., which prescribes how the Electoral Vote Count process takes place.

As for the Twentieth Amendment, as earlier motions described, no facts alleged suffice to

support a claim that Defendants could thwart the application of the Twentieth Amendment in

relevant part:

> 1: **The terms of the President and Vice President shall end at noon on the 20th day of January**, and the terms of Senators and Representatives at noon on the 3d day of January, of the years in which such terms would have ended if this article had not been ratified; and the terms of their successors shall then begin.

Amendment XX (*emphasis added*).

Presidential power will unavoidably be transferred every four years. According to the

Twentieth Amendment, president's term "shall end" at noon on January 20 every four years.

Therefore, allegations related to the Twentieth Amendment fail as a matter of law.  The

government has alleged that by entering the Capitol grounds as well as the Capitol, Mr. Meggs

27

"conspired" to oppose by force the lawful transfer of power, and "conspired" to "prevent, hinder, and delay the Certification of the Electoral College Vote."  As applied here then, the government's charging of § 2384 and § 1512(kInd (c)(2) and (2) does not require proof of any fact unique to either respective offense.  Thus, all remaining facts are duplicative for Counts 1, 2, and 3.

> *F.  Count V is to be Dismissed for Failure to State a Claim*

Count Five, 18 U.S.C. §§ 1361, 2, must be dismissed because the Government has failed to allege *any* facts sufficient to find that Mr. Meggs willfully injured or committed depredation against property of the United States.

## CONCLUSION

For all of the reasons stated above, Count One through Three, and Count Five are lacking in specific factual support.  Count 1 fails to put Defendant on Notice and is constitutionally vague, as are the Counts 2 and 3.  Both federal statutes are charged over conduct on public property during a rally that got out of control, and thus, the First Amendment applies.  Finally, the Indictment in pleading Count 1 together with Counts 2 and 3 violate double jeopardy standards.  Attached is a proposed order granted the requested relief, as required by LCvR 7(c).

[SIGNATURE ON NEXT PAGE]

Dated: July 11, 2022                    Respectfully submitted,

                                        _____/s/ Stanley E. Woodward, Jr._____
                                        Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
                                        BRAND WOODWARD, LP
                                        1808 Park Road, Northwest
                                        Washington, DC  20010
                                        202-996-7447 (telephone)
                                        202-996-0113 (facsimile)
                                        Stanley@BrandWoodwardLaw.com

                                        _____/s/ Juli Z. Haller_____
                                        Juli Z. Haller, (DC 466921)
                                        The Law Offices of Julia Haller
                                        601 Pennsylvania Avenue, Northwest, Suite 900
                                        Washington, DC 20004
                                        Telephone: (202) 729-2201
                                        HallerJulia@outlook.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| | )) **Case No. 1:21-cr-00015-APM** |
| **v.** | ) |
| | ) |
| **KELLY MEGGS,** | ) |
| | ) |
| **Defendant.** | ) |

## CERTIFICATE OF SERVICE

On July 11, 2022, the undersigned hereby certifies that a true and correct copy of the

foregoing was electronically filed and served via the CM/ECF system, which will automatically

send electronic notification of such filing to all registered parties.

                                         */s/ Stanley E. Woodward, Jr.*
                                    Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
                                    BRAND WOODWARD LAW, LP
                                    1808 Park Road, Northwest
                                    Washington, DC  20010
                                    202-996-7447 (telephone)
                                    202-996-0113 (facsimile)
                                    Stanley@BrandWoodwardLaw.com