UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 22-cr-15-APM |
| | : | |
| KELLY MEGGS, | : | |
| | : | |
| Defendant. | : | |

**OPPOSITION TO MOTION TO DISMISS
ON THE BASIS OF SELECTIVE PROSECUTION**

While Defendant Kelly Meggs moves this Court to dismiss the indictment in the above-captioned case for "selective prosecution," ECF No. 189, he fails to meet the rigorous standard for overcoming the presumption of regularity that attaches to Executive Branch prosecutorial decisions. *United States v. Armstrong*, 517 U.S. 456, 465-67 (1996). He presents no evidence—much less "clear evidence"—that the decision to prosecute him was "based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Id.* Meggs likewise fails to "demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* (citation and internal quotation marks omitted). His motion must be denied.

**PROCEDURAL AND FACTUAL BACKGROUND**

On January 12, 2022, the grand jury returned an indictment charging Meggs and his co-defendants with, among other charges, seditious conspiracy, in violation of 18 U.S.C. § 2384 (Count One); conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count Two); and obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Three). ECF No. 1. The grand jury returned a superseding indictment on June 22, 2022, but the superseding indictment did not add or remove any charges. The Indictment alleges

1

that the purpose of the seditious conspiracy charged in Count One was "to oppose the lawful transfer of presidential power by force, by opposing by force the authority of the Government of the United States and by preventing, hindering, or delaying by force the execution of the laws governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code." *Id*. at ¶ 16.  Referencing the acts in furtherance of the seditious conspiracy charged in Count One, the Indictment further alleges that the defendants and their co-conspirators conspired to and did obstruct, influence, and impede the Certification of the Electoral College vote (Counts Two and Three). *Id.* at ¶¶ 136, 138.

The Indictment alleges that days after the 2020 U.S. Presidential Election, co-defendant Elmer Stewart Rhodes III began disseminating messages to Oath Keepers members and affiliates delegitimizing the results of the election and encouraging members and affiliates of his organization to forcibly oppose the lawful transfer of presidential power from former President Trump to President Biden.  On November 5, 2020, Rhodes told those on the "Leadership intel sharing secured" chat ("Leadership Intel Chat"), including Meggs, that they "MUST refuse to accept Biden as a legitimate winner" and warned, "We aren't getting through this without a civil war.  Too late for that.  Prepare your mind, body, spirit." ECF No. 1 at ¶ 18(a).  A few days later, on the Oath Keepers' website, Rhodes shared a recommendation to follow the example of Serbians who had achieved regime change by "[m]illions gather[ing] in our capital," breaking through barricades, and storming the legislature.  *Id.* ¶ 18(b)

On November 9, 2020, Rhodes held a private GoToMeeting—an online meeting site that allows users to host conference calls and video conferences via the Internet—titled, "Oath Keepers National Call – Members Only," which was attended by Meggs and other co-defendants and co-conspirators.  During the meeting, Rhodes outlined a plan to stop the lawful transfer of presidential

power, including preparations for the use of force, and urged those listening to participate. *Id.* ¶ 18. Immediately after that meeting, Meggs sent a message to an invitation-only Signal group chat titled, "OKFL Hangout" ("OKFL Hangout Chat"), which included co-defendants and other co-conspirators, in which he stated, "Anybody not on the call tonight.  We have been issued a call to action for DC.  This is the moment we signed up for . . . ." In the days and weeks that followed, Meggs and other regional leaders of the Oath Keepers began recruiting others into the conspiracy, *id.* at ¶ 20, and preparing for operations inside Washington, D.C., *id.* at ¶ 21.  Those plans included preparing multiple ways to deploy force to achieve their aim of stopping the transfer of presidential power, including the organization of armed "quick reaction force" or "QRF" teams to support those on the ground.  *Id.* at ¶¶ 4, 42-45.  On November 22, 2020, the Florida chapter of the Oath Keepers—including Meggs and two of his co-defendants—held a training on "unconventional warfare."

In December 2020, Rhodes focused his co-conspirators on the Certification proceeding set to take place on January 6, 2021.  During a December 22 interview with a regional Oath Keepers leader, Rhodes described January 6 as "a hard constitutional deadline" for stopping the transfer of presidential power and warned that if President-Elect Biden were to assume the presidency, "We will have to do a bloody, massively bloody revolution against them."  ECF No. 1 at ¶ 30.  On December 23, Rhodes published an open letter on the Oath Keepers website in which he noted that, on January 6, 2021, "tens of thousands of patriot Americans, both veterans and non-veterans, will already be in Washington D.C., and many of us will have our mission-critical gear stowed nearby just outside D.C."  *Id.* at ¶ 31.  Rhodes warned in the open letter that he and others may have to "take to arms in defense of our God given liberty."  *Id.*

Meggs also began to focus on January 6 around this time, sending Facebook messages on December 22, 2020, stating:

> Trump said
> It's gonna be wild !!!!!!!
> It's gonna be wild !!!!!!!
> He wants us to make it WILD that's what he's saying . He called us
> all to the Capitol and wants us to make it wild !!!
> Sir Yes Sir !!!
> Gentlemen we are heading to DC pack your shit !!

Gov. Opp. to Renewed Request for Pretrial Release, *U.S. v. Meggs*, No. 21-cr-28-APM, ECF No. 98 at 8.  He added, "[W]e will have at least 50-100 OK there [on January 6]," and noted, "Plus we have made Contact with PB [an apparent reference to the Proud Boys] and they always have a big group . Force multiplier[.]  I figure we could splinter off the main group of PB and come up  behind them . Fucking crush them for good[.]"  On December 25, Meggs messaged the "OKFL Hangout" Signal chat, in reference to the January 6 Joint Session, "We need to make those senators very uncomfortable with all of us being a few hundred feet away.*"  Id*. at ¶ 34.  Rhodes wrote in the same chat, "I think Congress will screw him [President Trump] over.  The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing.  But I don't think they will listen." *Id.*

Rhodes, Meggs, and their co-conspirators created and administered encrypted chats on the Signal platform with titles like "DC OP: Jan 6 21" and "OK FL DC OP Jan 6" for coordinating their plans for January 6.  ECF No. 1 at ¶¶ 38-40.   On these chats, they discussed, among other topics, the need for operational security, what weapons they would bring, and plans for the QRF. *Id*. at ¶¶ 41-56, 58-60.  Meggs took a lead in planning for the QRF.  *See id.* at ¶ 42 (alleging that Meggs told an acquaintance that his group would "have a heavy QRF 10 Min out though"); *id.* at ¶ 49 (noting that, on the morning of January 2, 2021, Megges messaged the "DC OP: Jan 6 21"

4

Signal chat, "Good call last night. Lots covered, I'll get with NC team today and find out QRF location[.]"); *id.* at ¶ 50 (later that day, Meggs told Rhodes, "Last night call … we discussed a QRF RP so we may do that. As well as the NC team has a hotel room close by," and Rhodes responded, "Ok. We WILL have a QRF. this situation calls for it.").

When the co-conspirators arrived in the Washington, D.C., metropolitan area on January 5, 2021, most of the defendants in this case—including Meggs—dropped off firearms, ammunition, and tactical equipment with members of the QRF at a hotel in northern Virginia that co-defendant Thomas Caldwell had identified. ECF No. 1 at ¶¶ 45, 68-69. Caldwell explored the idea of using boats to surreptitiously transport members of the QRF across the Potomac River into D.C. *Id.* at ¶ 53. On the morning of January 6, Rhodes messaged a Signal chat of co-conspirators, "We will have several well equipped QRFs outside DC. And there are many, many others, from other groups, who will be watching and waiting on the outside in case of worst case scenarios." *Id.* at ¶ 70. Around that same time, co-defendant Edward Vallejo and another QRF member spoke on a podcast and discussed the possibility of "armed conflict" and "guerilla war" and explained that "there are people who are prepared, have the will, have the facilities to do more than taunt." *Id.* at ¶ 71.

On January 6, as a large crowd gathered on the Capitol grounds and converged on the building, an Oath Keeper affiliate on the "Leadership Intel Chat" claimed that "Antifa" had breached the Capitol. ECF No. 1 at ¶ 77. Rhodes replied: "Nope. I'm right here. These are Patriots." *Id.* He elaborated on a different chat that Vice President Pence—who was presiding over the counting of electoral votes in Congress in his capacity as President of the Senate—was "doing nothing. As I predicted. . . . All I see Trump doing is complaining. I see no intent by him to do anything. So the patriots are taking it into their own hands. They've had enough." *Id.*

5

Meanwhile, on yet another encrypted, invitation-only group chat titled "Jan 5/6 DC Op Intel team," which included Rhodes, co-conspirator Joshua James, and others, a participant posted a link to a video titled "live stream of patriots storming capital," and another participant asked, "Are they actually Patriots - not those who were going to go in disguise as Patriots and cause trouble[?]" *Id.* at ¶ 79. Rhodes responded, "Actual Patriots. Pissed off patriots[.] Like the Sons of Liberty were pissed off patriots[.]" *Id.* James and several co-conspirators (including Roberto Minuta and Brian Ulrich) then headed toward the Capitol. *Id.*

Around 2:30 p.m. on January 6, Rhodes explicitly directed his co-conspirators to go to the Capitol. ECF No. 1 at ¶¶ 88-89. Rhodes then spoke with Meggs. *Id.* at ¶ 92. Moments later, Meggs led a group of the defendants in stack formation ("Stack One") up the east steps of the Capitol, joined the mob that was trying to force the doors open, and breached the building. *Id.* at ¶¶ 93-95, 97-99. Once inside, half of Stack One was rebuffed as they tried to force their way past riot police to the Senate Chamber; the other half went in search of Speaker of the House Nancy Pelosi. *Id.* at ¶¶ 100-106. Meanwhile, another group of the defendants ("Stack Two"), led by James and Minuta, arrived at the Capitol grounds shortly after 2:30 p.m. *Id.* at ¶ 111. Stack Two then penetrated the restricted Capitol grounds, marched to the east side doors through which Stack One had entered, and breached the Capitol at approximately 3:15 p.m. *Id.* at ¶¶ 113-118. Members of Stack Two tried to force their way into the Rotunda but were expelled by riot police officers who had begun clearing the building. *Id.* at ¶¶ 119-121. After they left the Capitol, members of both Stack One and Stack Two met up with Rhodes and other Oath Keeper members and affiliates just outside the Capitol. *Id.* at ¶ 124.

On the evening of January 6, Rhodes gathered some of his co-conspirators at a restaurant to celebrate their attack on the Capitol and discuss next steps. ECF No. 1 at ¶ 125. Rhodes also

sent messages to the "DC OP: Jan 6 21" Signal chat, including: "Thousands of ticked off patriots spontaneously marched on the Capitol. . . . You ain't seen nothing yet," and, "Patriots entering their own Capitol to send a message to the traitors is NOTHING compared to what's coming." *Id.* at ¶ 126.  Meggs echoed Rhodes, adding to that same Signal chat a message stating, "We aren't quitting!! We are reloading!!" *Id.*

In the weeks after January 6, Rhodes purchased a large arsenal of firearms and tactical equipment. ECF No. 1 at ¶ 129.  In total, during the two-week period from the January 6 attack to the January 20 Inauguration, Rhodes spent more than $17,000 on firearms and related equipment. *Id.*  Rhodes also summoned co-conspirators to join him in Texas. *Id.* at ¶ 130.  James collected what he referred to as "all available firearms" and traveled to Texas where he stayed with Rhodes and others.  *Id.*  On January 10, James sent Meggs a message asking if Meggs and other Florida Oath Keepers were coming to Texas to join him and Rhodes, and Meggs responded, "Fl stays home until shots fired !" *Id.* at ¶ 131.

Meggs was first indicted for his participation in this conspiracy under the matter of *United States v. Caldwell, et al.*, Case No. 21-cr-28-APM, in February of 2021.  Several Rule 12 motions deadlines in both the *Caldwell* case and the above-captioned case have come and gone; however, new counsel recently entered their appearance and requested an opportunity to file new motions on Meggs' behalf.  On July 11, 2022, new counsel filed the instant motion seeking dismissal of the indictment for "selective prosecution."

## ARGUMENT

Meggs' motion fails to meet the threshold evidentiary showing to overcome the presumption of regularity afforded by the long-established case law to prosecutorial charging decisions.

I.        **Legal Framework**

Because "[t]he Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws," a "presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their duties." *Armstrong*, 517 U.S. at 464 (internal quotation marks and citations omitted). This presumption "rests in part on an assessment of the relative competence of prosecutors and courts." *Id.* at 465. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Id.* (citation omitted); *see also United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) ("[J]udicial authority is … at its most limited when reviewing the Executive's charging determinations" because "the Judiciary … generally is not competent to undertake that sort of inquiry.") (internal quotation marks and citations omitted).

To overcome that presumption, a defendant must present "clear evidence" that a decision to prosecute was "based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Armstrong*, 517 U.S. at 464-465. "The claimant must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Id*. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

Concerned that selective-prosecution inquiries "will divert prosecutors' resources and may disclose the Government's prosecutorial strategy," the Supreme Court has also imposed a "correspondingly rigorous standard for discovery in aid of such a claim." *Armstrong*, 517 U.S. at 468. The defendant must initially produce "some evidence tending to show the existence of the essential elements of" selective prosecution: "discriminatory effect and discriminatory intent." *Id*.

8

(citation omitted).  The defendant's evidence must also be "credible"—something more than "personal conclusions based on anecdotal evidence." *Id*. at 470.  "If either part of the test is failed," the defendant cannot "subject[] the Government to discovery." *Att'y Gen. of United States v. Irish People, Inc*., 684 F.2d 928, 947 (D.C. Cir. 1982).

## II.  Discussion

Meggs bases his claim of selective prosecution solely on generalized public statements by President Biden and Department of Justice officials about the January 6 attack on the Capitol and inapt comparisons to the charges brought against individuals who participated in dissimilar events in Portland, Oregon, and Washington, D.C.  Meggs' motion fails to adduce any credible evidence—as *Armstrong* demands—supporting an inference that (1) the government has treated him differently than other similarly situated defendants, or (2) any such disparity implicates his political association.

### A.  Meggs' motion adduces no evidence of discriminatory effect.

Meggs has not made the requisite showing that he was singled out for prosecution from those similarly situated.  A person is "similarly situated" for purposes of a selective prosecution claim "when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000) (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997)).  Or, as the Eleventh Circuit has concluded, a person is "similarly situated" for selective prosecution purposes if he "engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement

9

plan—and against whom the evidence was as strong or stronger than that against the defendant." *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000).

Other judges on this Court have rejected defendants' argument that the government has treated participants in the January 6 attack more severely than the subjects who participated in riots in Portland in the summer of 2020. For instance, Judge McFadden, in denying a similar motion, observed that "[a]lthough both Portland and January 6 rioters attacked federal buildings, . . . the Portland defendants primarily attacked at night, meaning that they raged against a largely vacant courthouse." *United States v. David Lee Judd*, No. 21-cr-40-TNM, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). "In contrast," Judge McFadden explained that "the January 6 rioters attacked the Capitol in broad daylight," as "[t]housands of congressional staffers," "hundreds of legislators and the Vice President" were inside. *Id*. Because "the[se] actions endangered hundreds of federal officials in the Capitol complex," *id*., Judge McFadden held that the defendant in that case "failed to make a credible showing of different treatment of similarly situated persons"—as *Armstrong*'s first prong demands. *Id*. at *6 (internal quotation marks omitted).

What was true in *Judd* is true here. Meggs, his co-defendants, and others around them attacked and breached the Capitol Building as the Vice President, Members of Congress, and thousands of staffers convened inside. And in so doing, they interrupted and delayed the certification of a presidential election. Additionally, Meggs and his co-defendants are alleged to have attacked the Capitol as part of a larger conspiracy to oppose by force the lawful transfer of power following the 2020 U.S. Presidential Election. That plan involved the staging of armed QRF teams who were prepared to ferry an arsenal of firearms into the hands of Meggs and his co-defendants in furtherance of the conspiratorial plan. The conduct and conspiracy of Meggs and his co-defendants, and the "threat to civilians," *id*. at *5, and to our democracy, that they

10

engendered, differentiates Meggs and his co-defendants from the Portland protestors whom Meggs puts forward as a comparative class, and thus dispels his claim of selective prosecution based on the alleged disparate treatment of these two groups.

Meggs also references the Lafayette Square protest in June 2020—intimating that the government treated him more severely than individuals who engaged in vandalism and looting attendant to that protest. ECF No. 189 at 5 n.1, 10. This contention fails to show disparate treatment because the cited instances of looting and vandalism did not threaten the safety of nearly as many individuals who were harmed or threatened on January 6, nor did it involve an extensive conspiracy to undermine fundamental aspects of our democratic system of government. Meggs' conduct, and the conduct of his co-defendants, did. *Cf. Judd*, 2021 WL 6134590, at *5.

Finally, Meggs' conduct is nothing like the conduct he cites of protestors at Supreme Court nomination proceedings and other hearings at the Capitol. He observes, "There are no prior cases in which protestors at the Capitol have been charged with charges under Obstruction of Justice, 18 U.S.C. § 1512, much less § 2384." ECF No. 189 at 6. None of those other instances, however, involved anywhere near the scale of violence or threats to our democracy presented by the conduct of Meggs and his co-defendants. Those defendants whose conduct *is* similar to Meggs'—namely, his co-defendants in this case, and the defendants in the matter of *United States v. Nordean, et al.*, No. 21-cr-175-TJK—have been charged consistently with Meggs.

For all these reasons, Meggs has failed his threshold showing on *Armstrong*'s first element.

### B. Meggs' motion adduces no evidence of discriminatory purpose.

With respect to *Armstrong*'s second prong, Meggs has failed to adduce any evidence that improper motives undergird this prosecution. As evidence of improper motive, Meggs cites statements by President Joseph R. Biden Jr., Attorney General Merrick Garland, and former Acting

11

United States Attorney Michael R. Sherwin condemning the violence of those who attacked the Capitol on January 6. However, nothing in these statements supports an inference that Meggs and his co-defendants have been singled out due to their political associations. Rather, these statements focused on the violence, property damage, and threat to our democracy inflicted by those who attacked the Capitol on January 6. As described in greater detail above, the actions taken and harm caused by Meggs and his co-defendants support the decision to charge them with the serious offenses alleged in the Indictment and undermine any suggestion that they are being selectively prosecuted for their political views.

## CONCLUSION

For these reasons, Defendant Meggs' motion to dismiss for selective prosecution should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By: _____
Kathryn L. Rakoczy
Assistant United States Attorney
D.C. Bar No. 994559
Ahmed M. Baset
Troy A. Edwards, Jr.
Jeffrey S. Nestler
Assistant United States Attorneys
Louis Manzo
Special Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

/s/ Justin Sher
―――――――――――――
Justin Sher
Alexandra Hughes
Trial Attorneys
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20004