IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CRIMINAL NUMBER: |
| : | |
| ELMER STEWART RHODES III, : | 22-cr-15-APM |
| KELLY MEGGS, : | |
| KENNETH HARRELSON, : | |
| JESSICA WATKINS, : | |
| ROBERTO MINUTA, : | |
| JOSEPH HACKETT, : | |
| DAVID MOERSCHEL, : | |
| THOMAS CALDWELL, and : | |
| EDWARD VALLEJO, : | |
| : | |
| Defendants. : | |

**OPPOSITION TO MOTION TO CONTINUE OR CHANGE VENUE**

The trial against Stewart Rhodes, Kelly Meggs, Kenneth Harrelson, Jessica Watkins, and Thomas Caldwell should start on September 26, 2022, before this Court, in this jurisdiction. These five defendants collectively filed a Joint Motion to Transfer Venue or Continue Trial Date, ECF No. 193 ("Joint Mot."); Rhodes separately filed an addendum, ECF No. 194 ("Rhodes Mot. #1"); Meggs separately filed his own motion to continue, ECF No. 198 ("Meggs Mot."); and Rhodes separately filed a second addendum, ECF No. 201 ("Rhodes Mot. #2). All four motions should be denied.

The Court should deny the defendants' motion for a continuance. The defendants' litany of complaints about the House Select Committee to Investigate the January 6th Attack on the United States Capitol's hearings do not justify a continuance in this case. The various additional reasons set forth by defendants concerning access to discovery materials and scheduling conflicts are neither compelling nor persuasive. Likewise, the Court should deny the defendants' renewed motion for a change of venue. The Court has twice denied the defendants' motions to change

venue. *United States v. Rhodes*, No. 22-cr-15 (APM), ECF No. 176; *United States v. Caldwell*, 21-cr-28 (APM), ECF No. 415. Circumstances have not changed. As this Court previously noted, "[i]n the end, the appropriate way to identify a biased jury pool is through *voir dire*." *Rhodes* ECF No. 176 at 44. Indeed, because the Court instructed the defendants that they were "free to renew their motion to transfer during or following the *voir dire* process," *id.*, the present motion is premature and unfounded.

> I. **The Defendants' Various Complaints about the Impact of the Select Committee Hearings Do Not Justify a Continuance or a Change of Venue**

The defendants allege that the trial against them must be continued, or the venue changed, because of the "highly inflammatory and prejudicial hearings" conducted by the Select Committee. Joint Mot. at 7. The defendants further complain, without evidence, that the District of Columbia is "heavily-biased" and "anti-Trump," and that the "hearings have been largely consumed by left-leaning, politically-obsessed viewers" who "have been glued to their television sets." Joint Mot. at 10, 12. And, "[t]hanks to a biased press, practically everyone in D.C., without knowing any of the facts, is convinced that the *Rhodes* defendants are guilty." *Id.* at 11 n.6.

As Judge Amy Berman Jackson concluded last week in denying a motion for change of venue in *United States v. Gabriel Garcia*, No. 21-cr-129 (July 22, 2022, Mem. Op.), ECF No. 83, the defendants' arguments are "largely predicated on sweeping, unsupported assertions about a city [they do] not appear to know or understand." The defendants are wrong to groundlessly assert that the Select Committee's hearings have caused "undeniable prejudice," Joint Mot. at 1, in the District's jury pool. "This is a city filled with actual living, breathing, eating Americans. Not vessels for one ideology or another, empty suits and empty ideas." *Garcia* Mem. Op. at 1 (citing Anthony Bourdain). Contrary to the defendants' allegations about *local* news coverage, the news coverage about the events of January 6 and the Select Committee's hearings have been *national*.

2

*Id.* at 14, 27-29; *see also Caldwell* Omnibus Order, ECF No. 415, at 11 (noting the *national* media attention into the events of January 6).

The defendants have failed to establish that the hearings justify a continuance or that the normal course of *voir dire* will be insufficient to ensure an impartial jury.

A. **The Select Committee's actions do not support a continuance or transfer**

The defendants' allegations about certain statements or actions made by Select Committee members or witnesses are inaccurate or irrelevant, or both.

*First*, the defendants complain that they were prejudiced because Rep. Jamie Raskin asserted that what occurred on January 6 was an "insurrection[]." Joint Mot. at 5. But several judges have already found that what the rioters did at the Capitol on January 6 was an "insurrection." *See United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (describing rioters as people who "participated in the insurrection"); *United States v. Rivera*, No. 21-cr-60 (CKK), 2022 WL 2187851, at *1 (D.D.C. June 17, 2022) (finding as "fact," following a bench trial, that the defendant participated in an "insurrection at the United States Capitol"). A statement from a congressperson during a congressional hearing[1] using the same word has no impact on whether this trial should be continued or moved.

*Second*, the defendants claim that the Select Committee has not "stated or reinforced that the *Rhodes* defendants are constitutionally presumed innocent." Joint Mot. at 2. But the

---

[1] The defendants oddly claim that the Select Committee's hearings "are not hearings at all," Joint Mot. at 2, presumably in an attempt to discredit the Committee's efforts. While the government need not defend or justify the Committee, which works independently, *see* note 2, *infra*, the Committee does appear to have conducted "hearings." *See* House Select Committee to Investigate the January 6th Attack on the United States Capitol, Hearings, *available at* january6th.house.gov/legislation/hearings (listing each "hearing" conducted by the Select Committee); *see also* "Hearing," Black's Law Dictionary (11th ed. 2019) (definition 3: "In legislative practice, any proceeding in which legislators or their designees receive testimony about legislation that might be enacted.").

3

Committee members noted repeatedly that the defendants had only been *charged* with committing criminal acts. *See, e.g.,* July 21, 2022, House Jan 6. Comm. Hr'g Tr. (Rep. Adam Kinzinger: "In this video, you'll see surveillance footage from the Rotunda that shows a group of Oath Keepers, including Jessica Watkins, who's been charged with seditious conspiracy."); July 12, 2022, House Jan 6. Comm. Hr'g Tr. (Rep. Raskin: "The Department of Justice has charged leaders of both groups with seditious conspiracy to overthrow the government of the United States on January the sixth."); June 28, 2022, House Jan. 6 Select Comm. Hr'g Tr. (Rep. Liz Cheney: "As we now know, multiple members of [the Oath Keepers] have been charged with or pled guilty to crimes associated with January 6th."); June 13, 2022, House Jan. 6 Select Comm. Hr'g Tr. (Rep. Cheney: "[H]undreds of our countrymen have faced criminal charges."); June 10, 2022, House Jan. 6 Select Comm. Hr'g Tr. (Rep. Cheney: "Multiple members of two groups, the Oath Keepers and the Proud Boys have been charged with this crime for their involvement in the events leading up to and on January 6th."); June 10, 2022, House Jan. 6 Select Comm. Hr'g Tr. (Rep. Bennie Thompson: "Individuals associated with two violent extremist groups have been charged with seditious conspiracy in connection with the January 6th attack".). And while there is no requirement that the Select Committee's members repeatedly highlight the presumption of innocence during their hearings, the Court will of course instruct the jury about the presumption. *See* Criminal Jury Instructions for the District of Columbia, Instruction 2.107.

*Third*, the defendants claim that "Members of the Committee and witnesses have repeatedly referred to the Oath Keepers as 'racists,' 'domestic terrorists,' 'white supremacists,' 'extremists,' and other false slurs." Joint Mot. at 2-3. The Committee members have not, as far as the government is aware, explicitly made such statements in public, and certainly not "repeatedly." At the Select Committee's July 12, 2022, hearing, Rep. Raskin said, "As we'll see,

4

Donald Trump's 1:42 AM tweet electrified and galvanized his supporters, especially the dangerous extremists in the Oath Keepers, the Proud Boys, and other racist and white nationalist groups spoiling for a fight against the government." While he did say that the Oath Keepers as a group had among them "dangerous extremists," he did *not* say that the entire group constituted "dangerous extremists," nor did he say that the Oath Keepers as a group were "racist" or "white nationalist." Hearing witness Jason Van Tatenhove similarly alleged Stewart Rhodes strategically recruited from a member base that "drifted further and further right into the alt right world into white nationalists and even straight up racists." July 12, 2022, House Jan. 6 Select Comm. Hr'g. He did not, however, allege that every member of the Oath Keepers, or the group as a whole, or even Rhodes himself was racist. Regardless, a small number of remarks at a single Select Committee hearing is not "pervasive, adverse publicity"—and such publicity would not even "inevitably lead to an unfair trial." *Skilling v. United States*, 561 U.S. 358, 381 (2010) (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)).

*Fourth*, the defendants lodge many complaints about statements made Mr. Van Tatenhove at the Select Committee's July 12 hearing. Joint Mot. at 5-7; Meggs Mot. at 7. But Chairman Thompson made clear that Mr. Van Tatenhove was providing *background* on the Oath Keepers and Rhodes. *See* July 12, 2022, House Jan. 6 Select Comm. Hr'g Tr (Rep. Thompson: "Mr. Van Tatenhove, can you help us understand who the Oath Keepers are?"). Additionally, Mr. Van Tatenhove made clear his relationship with the Oath Keepers and Rhodes had been severed well before January 6. *Id.* (referencing that he spent a "a few years" with the Oath Keepers following the Sugar Pine Mine standoff, which occurred in 2015); *see also id.* (Rep. Raskin: "I want to get your thoughts about this in the context of your *prior relationship* with Stewart Rhodes.") (emphasis added). Indeed, the very news media article about Mr. Van Tatenhove's background cited by the

5

defendants notes that he "met the Oath Keepers in 2014" and "quit the organization after a couple of years." Joint Mot. at 6 (quoting Brad Dress, "Who is Oath Keepers spokesperson Jason Van Tatenhove?," *The Hill* (July 11, 2022)). Regardless, a few statements made by a witness at a single congressional hearing do not trigger a presumption of prejudice. *Skilling*, 561 U.S. at 381.

*Fifth*, the defendants complain that the Select Committee "made several assertions connecting the Oath Keeper defendants with the Proud Boys defendants." Rhodes Mot. at 2; *see also* Meggs Mot. at 5-6 (complaining about the Select Committee's statements linking Meggs with Proud Boys and Three Percenters). But the Select Committee appears to have merely repeated publicly available information drawn from court filings. *See* Govt Opp. to Meggs' Renewed Request for Pretrial Release, in *Caldwell*, ECF No. 98, at 7-10 (listing Meggs' Facebook messages about coordination with Proud Boys and Three Percenters); Second Superseding Indictment, in *United States v. Ethan Nordean*, 21-cr-175 (TJK), ECF No. 205, at ¶ 23 (alleging that Rhodes met with Proud Boys leader Enrique Tarrio on January 5).

*Sixth*, Meggs' complaint that the Select Committee is "prejudic[ing]" him by "dissemination of information not previously disclosed through discovery," Meggs Mot. at 5-6 (emphasis deleted), is wrong. He long ago received in discovery records from his Facebook account, cellphone extraction, and phone records, as well as Signal messages, which generally and collectively show his messages about coordination with Proud Boys and Three Percenters, photos of him with Roger Stone, and records showing communications between him and Tarrio and him and Stone.

*Seventh*, while the defendants make an outlandish and unfounded accusation that Select Committee members "may selectively 'leak' transcripts harmful to the *Rhodes* defendants during trial," Joint Mot. at 11, they do not explain why a continuance or venue transfer would somehow

6

lessen any alleged prejudice that would result from an action that would occur during the trial with an intent to affect the trial.

  **B. <u>The Court should not continue this case based on surmise about when and whether the Select Committee will release witness transcripts</u>**

  The defendants suggest that a continuance is necessary to allow them time to review any witness transcripts that the Select Committee may later release. Meggs Mot. at 9; Joint Mot. at 8. But this argument does not warrant a continuance at this stage. First, this Court already rejected that argument. *See Rhodes* 5/6/22 Tr. at 36 (when granting the defense's prior continuance motion, the Court cautioned, "I am not committing to an indefinite trial extension because of Congress' work"). Second, Chief Judge Howell pointed out this argument's fallacy: "Taken to its logical endpoint, defendant's argument would preclude nearly *any* criminal trial on *any s*ubject, *ever*, from proceeding, as it is *always* possible that relevant information exists somewhere that is not fully known by or in the possession of the parties." *United States v. Anthony Williams,* 21-cr-377, ECF No. 108, at 5-6. Third, as the defendants' motion notes, Joint Mot. at 8, the government did not oppose a defense continuance request in *United States v. Nordean*, 21-cr-175 (TMK), based on a concern that *relevant* witness transcripts would be publicly released *during that trial*. *See* Govt Opp. to Motion to Dismiss Superseding Indictment (*Rhodes* ECF No. 186) at 5 (explaining why the government's consent to continue the August trial date in *Nordean* was not a "concession" about prejudice in the jury pool). The government's position in *Nordean* was prudential and unique to that case; it is not binding here. Any such concerns in this case are lessened significantly by the likely relevancy *to these particular defendants* of any Select Committee witness transcripts. As discussed above, there has been very little actual testimony or information at the Select Committee hearings on the conduct allegedly committed by these defendants in this case.

In any event, whether and when the Select Committee releases witness transcripts remains outside the control of the parties in this case, and the Court should not continue the trial based on speculation about whether and when such transcripts may become available.

### C. Defendants' reliance on *Delaney* is misplaced

Defendants rely, primarily, on *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952), Joint Mot. at 9; Meggs Mot. at 6-7, a 70-year-old out-of-circuit decision that is neither binding nor persuasive, in support of their motion to continue the trial. This reliance is misplaced. First, in the context of prosecutions arising out of Watergate, the D.C. Circuit both distinguished *Delaney* and found that "decisions by the Supreme Court subsequent to *Delaney*" counseled against the D.C. Circuit exercising its unique "supervisory power" to insist that the trial court grant the defendants' requests for a continuance or change of venue. *United States v. Haldeman*, 559 F.2d 31, 63 n.40 (D.C. Cir. 1976) (en banc) (per curiam).

Second, *Delaney* involved parallel criminal and congressional investigations into that particular defendant, who had been the Collector of Internal Revenue for the District of Massachusetts, and his alleged crimes. *Id*. at 109. After Delaney was criminally indicted, a congressional committee began a series of public hearings "focused upon alleged derelictions of appellant Delaney." *Id*. at 110. The press coverage—specific to Delaney—was intense and focused on the committee's investigation and findings relating to the very crimes for which Delaney was to be tried. *Id*. at 111 ("The newspaper publicity was characterized by flamboyant, front-page headlines in large, heavy type, covering colorful feature stories emphasizing the more striking aspects of the testimony. This was supplemented by radio and television exploitation of the same material."). As described above, however, these defendants' case could not be more different from Delaney's—because the congressional hearings in question are not about them, nor

8

have the hearings focused on them specifically. Moreover, the media coverage surrounding the Select Committee's hearings is overwhelming focused on individuals other than these defendants.

As Chief Judge Howell recently ruled, "[a]lthough the Committee Hearings are garnering public attention and appear to be continuing an investigation into the events of January 6 *writ large*, this is not sufficient reason… to delay *this* defendant's trial." ECF No. 108 in *Williams*, 21-cr-377 (June 28, 2022). The same is true here. The Chief Judge went on to distinguish *Delaney*, because, as noted above, the defendant himself was a principal subject of the concurrent proceedings; the *Williams* defendant, like the defendants here, is "charged with only playing a small part" in the proceedings before the Congress. *Id.* at 4.[2]

### D. **The normal course of *voir dire* will be sufficient to ensure an impartial jury**

The defendants have failed to establish that the normal course of *voir dire* will be insufficient to ensure an impartial jury. Instead, their motions retread baseless claims against the District's residents. Indeed, recent jury trials held in this District demonstrate the ability to empanel an impartial jury despite media attention regarding the Select Committee's recent hearings. Just last week, for instance, Judge Nichols was able to select an impartial jury in the

---

[2] Relatedly, the defendants allege that the Select Committee and Department of Justice "are following the actions of each other." Joint Mot. at 3. But mere awareness of a parallel investigation is without legal significance. And the motion itself shows that contrary to colluding or coordinating, the two branches of government are operating independently. *See* Joint Mot. at 3 (quoting Rep. Kinzinger: "We have these two investigations—and again, I don't know what Justice is or is not doing, but assuming they're investigating, we have our investigation that's very public) (emphasis added); *see also United States v. Ethan Nordean*, 21-cr-175 (TJK), June 24, 2022 Mem. Order (ECF No. 419) at 3 n.3 ("[T]he record suggests that the relationship between the Government and the Committee lacks the sort of coordination that Defendants presuppose."). Indeed, while the government requested, on April 20 and June 15, 2022, that the Select Committee provide witness transcripts, the Select Committee has not done so. *Cf.* 6/24/22 Tr. at 39-40 (THE COURT: "I'm not aware of any way for a federal court to get Congress to turn over records. . . . "[T]he evidence is not in the government's custody or control, so it's not technically subject to Rule 16. And if it's not forthcoming from Congress, I'm not sure there's a way to compel its production.").

9

contempt-of-Congress case against Steve Bannon, whose multiple similar motions to continue were denied. *See United States v. Stephen Bannon*, 21-cr-670 (D.D.C.) (July 18, 2022 PM trial transcript at 352) (showing that the court was able to locate 22 fair and impartial jurors in one day). The same day, Chief Judge Howell located 32 fair and impartial jurors while selecting a jury for a case against an alleged Capitol rioter. *See United States v. Matthew Bledsoe*, 21-cr-204 (D.D.C.) (July 18, 2022 trial transcript at 104-05).

The Court already rejected the defendants' inaccurate and generalized assessment of the hundreds of thousands of residents of the District. *See Caldwell* 9/8/21 Tr. at 101 (cautioning Caldwell against "casting aspersions upon the people that live in this district"); *Caldwell* Sept. 14, 2021 Omnibus Order (ECF No. 415) at 11 (denying Caldwell's earlier motion to transfer venue because, in part, Caldwell's assertions about prejudice in the District's jury pool "are based entirely on his own speculation"). Applying the factors articulated in *Skilling*, 561 U.S. at 381, the Court previously found the defendants' arguments "did not give rise to a presumption of prejudice" mandating a transfer of venue. *Rhodes* ECF No. 176 at 41. Nothing in the defendants' present motions changes that analysis.

## II. The Defendants' Remaining Allegations Justify Neither Continuance nor Transfer

The defendants remaining allegations do not support a continuance or a transfer of venue. The defendants dubiously allege that the government's filings "contributed to prejudicing the jury pool." Joint Mot. at 7.[3] But there is no precedent for the proposition that a court filing in a case

---

[3] It is ironic that the defendants complain about publicity related to this case. On July 6, one of Rhodes' lawyers told CBS News that Rhodes was planning to move to continue this trial—a full eight days before Caldwell's motion was filed. *See* Scott MacFarlane, "Attorney: Oath Keepers defendants agree 'to temporarily waive their speedy trial rights,'" *CBS News* (July 6, 2022), *available at* cbsnews.com/news/oath-keepers-defendants-waive-their-speedy-trial-rights-jan-6-hearings (quoting Rhodes' attorney Phillip Linder: "We will keep filing continuances (in the cases) until the Jan. 6 committee complies with the Justice Department's request for transcripts of

can serve as the basis for a motion to continue or transfer venue of that very case. The government's filing about lawyers' potential funding from Defending the Republic was based on two public articles, which appear to themselves have been based on statements that Meggs' own lawyer made to reporters. *See* Motion for Inquiry Pursuant to D.C. Rule of Professional Conduct 1.8(e) (*Rhodes* ECF No. 166) (attaching articles from *BuzzFeed News* and *Mother Jones*, both of which quoted statements about the fee arrangements from Jonathon Moseley). And the government publicly filed its Rule 404(b) disclosures and motion because it was required to. *See* Pretrial Scheduling Order (*Rhodes* ECF No. 133) at 3 (providing deadlines for Rule 404(b) disclosures and motions in limine); *Rhodes* ECF. No. 190 (clerk's office notation that the government's Rule 404(b) notice, ECF. No. 187, was a "motion").[4]

---

all of the witnesses they have allegedly interviewed"); *cf.* Local Rule of Criminal Procedure 57.7(b)(1) (lawyer has duty to not publicly release information if there is a "reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice").

And just two days later, Mr. Linder told a reporter that Rhodes wanted to testify publicly— "and not just on C-SPAN"—before the Select Committee, because he "specifically wants to respond to what Rep Liz Cheney (R-WY) has been saying about the Oath Keepers." *See* Scott MacFarlane, "Oath Keepers leader Stewart Rhodes wants to testify live before Jan. 6 select committee," *CBS News* (July 8, 2022), *available at* cbsnews.com/news/oath-keepers-leader-stewart-rhodes-jan-6-select-committee; MacFarlane News, Twitter, *available at* twitter.com/MacFarlaneNews/status/1545436157030400005. Moreover, Rhodes already publicized that he had testified before the Select Committee in February 2022, *after* he was indicted in this case. *See* Scott MacFarlane & Robert Legare, "Oath Keepers founder Stewart Rhodes spends 6 hours with House January 6 Committee," *CBS News* (Feb. 3, 2022), *available at* cbsnews.com/news/oath-keepers-stewart-rhodes-january-6-committee.

[4] The defendants claim prejudice from the Rule 404(b) motion's reference to Caldwell's written "death list" of certain Georgia election officials, arguing that it was not a "death list" but rather a doodle. Joint Mot. at 7-8. He is free to argue to the jurors that they should draw that inference, but the document itself will be provided to the Court as an exhibit and then introduced into evidence, allowing the jurors to decide for themselves.

11

The defendants are also wrong to state that jury questionnaires will be mailed to potential jurors. Joint Mot. at 11. As the Court previously explained, the prospective jurors will be summonsed to appear at the courthouse on September 13, 2022, to complete a questionnaire; the questionnaire itself will not be mailed. And the point of the questionnaire—for which the parties are attempting to negotiate agreed-upon language—is to *root out* bias. The defendants cannot credibly claim that the presence of a questionnaire itself *creates* bias. Furthermore, if the defendants believe that the questionnaire is likely to bias the jury pool, they should object to the process rather than premise a request for a continuance on this ground.

The Court should likewise reject Rhodes' attempt to muster additional reasons to continue the trial. Rhodes claims that he only recently obtained access to digital discovery, and that this puts "him at a great disadvantage as compared to the other co-defendants." Rhodes Mot. #1 at 1. But that argument does not support a continuance, in part because a defendant does not have a right to review discovery. *See United States v. Kvashuk*, No. 19-cr-0143-JLR, 2020 WL 569862, at *4 (W.D. Wash. Feb. 5, 2020) ([A] pretrial detainee's right to access the courts does not guarantee the relief [the defendant] seeks—increased access to a computer in preparation of his case and the opportunity to personally review all discovery produced by the Government.");*United States v. Thompson*, No. 2:10-cr-200-DBH, 2013 WL 1809659, at *6–7 (D. Me. Apr. 29, 2013), *aff'd*, 851 F.3d 129 (1st Cir. 2017) (holding that neither the Constitution nor Rule 16 imposes a duty on the government or court to allow a criminal defendant to personally review all discovery materials); *United States v. Faulkner*, No. 3:09-cr-249-D(02), 2011 WL 3962513, at *4 (N.D. Tex. Sept. 8, 2011) ("[The defendant's] personal review of the disclosed digital data prior to trial is not constitutionally required or otherwise legally mandated where, as here, [the defendant] is represented by counsel who has had the ability to review the discovery before trial."). And the

motion is silent on other efforts to allow Rhodes better access to review discovery. Rhodes' counsel have had access to the discovery materials since January 2022. Counsel can provide— and, per their latest filing, *see* ECF No. 201 at 2, *have* provided—copies of these discovery materials to Rhodes in hard copy. His counsel (or individuals working for them) can also meet with him in person to review the discovery.

Rhodes also suggests that the Court would be wise to delay this trial until after the D.C. Circuit addresses the government's interlocutory appeal from Judge Nichols' decision to dismiss an indictment charging a violation of Section 1512(c)(2). Rhodes Mot. at 2. But this Court has repeatedly rejected the defendants' arguments that a charge under Section 1512(c)(2) is somehow defective. *See Rhodes* ECF No. 176 at 26-27 (denying motions to dismiss this count and incorporating prior decisions on the same point). The fact of an interlocutory appeal in another case—which relates to only one charge in this multi-count indictment—should not affect the timing of the trial in this case.

Meggs argues that the trial should be delayed because of alleged "late disclosure of exculpatory information." Meggs Mot. at 2. For reasons the government can explain at a sealed hearing,[5] if necessary, Meggs is wrong. The information referenced in Meggs' motion both does not carry the import that Meggs alleges (due to an apparent misunderstanding of some of the records, which the government recently explained to Meggs' counsel) and does not warrant a continuance.

### III. Kelly Meggs Should Remain part of the September Trial Group

The Court ordered that Meggs would proceed to trial as part of the September trial group. Consolidated Pretrial Order, *Rhodes* ECF No. 133, at 1. In the present motion, Mr. Woodward

---

[5] The government is submitting a sealed supplement to explain this information.

13

and Ms. Haller, counsel for Meggs, state that they are unavailable for the September 26 trial in this case because of a commitment to represent Federico Klein, a defendant in a trial slated to begin on October 3 in *United States v. McCaughey*, No. 21-cr-40 (TNM). Joint Mot. at 9 n.2; Meggs Mot. at 9-10. First, Ms. Haller is not counsel in that case. Second, due to the importance of the present case and the public interest in a speedy trial, the government intends to inform Judge McFadden of its lack of opposition to Defendant Klein's motion to be tried separately from his co-defendants for the sole purpose of allowing Mr. Woodward to be available to try the present case. *Cf.* May 20, 2022 Mem. Order (ECF No. 290), in *McCaughey*, No. 21-cr-40 (finding that Rule 14(a) did not require Klein's severance). Given that Klein is not detained, and the government is amenable to allow Klein to be severed for trial for this purpose, Mr. Woodward (along with Ms. Haller) should be available to represent Meggs at the trial in this case starting on September 26.

## CONCLUSION

The government therefore respectfully requests that the Court deny the defendants' motions to continue or transfer venue.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:     /s/
Jeffrey S. Nestler
Assistant United States Attorney
D.C. Bar No. 978296
Ahmed M. Baset
Troy A. Edwards, Jr.
Louis Manzo
Kathryn Rakoczy
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530

                                                                                    /s/
_____
Justin Sher
Alexandra Hughes
Trial Attorneys
National Security Division,
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20004